ESTATE OF GEORGE L. CURY, DECEASED, ROBERT L. CURY, ADMINISTRATOR, ALLEGED TRANSFEREE, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 34165, 34388, 34715, 34716, 34842, 34843, 34863–34865, 34906, 34907, 34953, 34961–34971, 38412, 40703–40706, 40782. Filed November 23, 1954.

---

[1] These proceedings include the following consolidated cases: Estate of George L. Cury, Deceased, Robert L. Cury, Administrator, Alleged Transferee, Docket Nos. 34165, 34953 (George L. Cury died on May 15, 1954; on October 18, 1954, an order was entered substituting the administrator of the estate as petitioner in his place and the captions in all cases involving him were accordingly changed); Estate of George L. Cury, Robert L. Cury, Administrator, Docket No. 40703; Dahar Cury, Jr., Alleged Transferee, Docket No. 34388; Robert Cury, Alleged Transferee, Docket No. 34715; Robert Cury, Alleged Transferee, Docket No. 34716; A. B. Cury, Alleged Transferee, Docket No. 34842; A. B. Cury, Alleged Transferee, Docket No. 34843; Neal Gene Cury, Alleged Transferee, Docket No. 34863; Neal Gene Cury, Alleged Transferee, Docket No. 34864; Dahar Cury, Jr., Alleged Transferee, Docket No. 34865; Ruth Cury, Alleged Transferee, Docket No. 34906; Ruth Cury, Alleged Transferee, Docket No. 34907; Estate of Dahar Cury, Deceased, Sol W. Cury and Ann C. Romanus, Co-Administrators, Docket No. 34961; Estate of Dahar Cury, Deceased, Sol W. Cury and Ann C. Romanus, Co-Administrators, Docket No. 34962; Sol Cury, Alleged Transferee, Docket No. 34963; Sol W. Cury, Alleged Transferee, Docket No. 34964; Ann Cury Romanus, Alleged Transferee, Docket No. 34965; Ann Cury Romanus, Alleged Transferee, Docket No. 34966; Elizabeth Cury Ely, Alleged Transferee, Docket No. 34967; Elizabeth Cury Ely, Alleged Transferee, Docket No. 34968; D. Cury's Incorporated, Docket No. 34969; Sol W. Cury, Alleged Transferee, Docket No. 34970; Ann C. Romanus, Alleged Transferee, Docket No. 34971; Estate of Dahar Cury, Deceased, Sol W. Cury and Ann C. Romanus, Co-Administrators, Docket No. 38412; Dahar Cury, Jr. and Madeline Cury, Docket No. 40704; Robert Lee Cury, Docket No. 40705; Ruth Agnes Cury, Docket No. 40706; Neal Gene Cury, Docket No. 40782.

*Robert Ash, Esq.,* and *Charles H. Burton, Esq.,* for the petitioners in Docket Nos. 34165, 34388, 34715, 34716, 34863–34865, 34906, 34907, 34953, 40703–40706, and 40782.

*John Yates Merrell, Esq.,* and *Daniel S. Ring, Esq.,* for the petitioners in Docket Nos. 34961–34966, 34969–34971, and 38412.

*Michael Gould, Esq.,* for the petitioners in Docket Nos. 34842 and 34843.

*Paul E. Waring, Esq.,* for the respondent.

318

322

324

328

RAUM, *Judge:* Dahar Cury, a native of Syria, settled in Norton, Virginia, in 1910 with his wife, Elizabeth Haddad Cury. In the course of time he established a department store in Norton, and, up to his death on February 7, 1948, had opened branch stores in various towns within a 50-mile radius of Norton. His wife died on February 9, 1945. Dahar and Elizabeth filed joint income tax returns for the years 1941 to 1944, inclusive; individual income tax returns were filed by Dahar or on his behalf for the years 1945 to 1947, inclusive, and for the period from January 1, 1948, to February 7, 1948. Dahar was survived by ten children. The department stores had been operated under the name of D. Cury's as a sole proprietorship until July 31, 1946, when the business was incorporated and later known as D. Cury's, Incorporated. Dahar became the owner of all of the stock at that time, 90 per cent of which he continued to own up to the time of his death. He sold the remaining 10 per cent to his son George Cury. Income tax returns were filed on behalf of the corporation for the fiscal years ended July 31, 1947, and July 31, 1948.

The will of Dahar named his sons George, Dahar, Jr., and Sol as executors, and provided for the operation of the estate for a period of 20 years, when it was then to be divided among his heirs, the ten children or their successors. A bitter controversy developed among the executors, with George and Dahar, Jr., uniting against Sol. The remaining seven children were sharply divided in their loyalties to these three brothers, with the result that there were two camps, of five children each, in what has been described as a family feud. Litigation between these two groups promptly ensued in 1948 over the estate of their father. The pleadings in that litigation disclose a high degree of antagonism between the two opposing factions. On October 14, 1948, an agreement of settlement was reached between the parties. As a result of negotiations it was agreed that the group headed by Sol would make an offer, fixing the amount at which one faction would buy out the other, but that the other faction would have the option of determining whether it would buy or sell at that figure. The understanding was that the purchasing group would take over the entire estate subject to all liabilities. Sol's group fixed the amount at $275,000, or $55,000 for each child. The other group promptly accepted the offer as an offer to sell to Sol's group at that price, and a contract was executed on that day, October 14, 1948. Thereafter, on November 17, 1948, the three executors having meanwhile resigned, the State court ruled that the provisions in Dahar's will for operating the estate for 20 years were ineffective. It decreed that the entire estate should vest immediately, equally and jointly, in the ten children,

and that each of them owned absolutely a one-tenth undivided interest in the estate. In the same decree, the court approved the contract of October 14, 1948, whereby Sol's group had agreed to purchase the interests of the children in George's group for $55,000 each, the purchasers undertaking to pay Federal and local taxes. After entry of the decree, the children in George's group conveyed their interests in the estate to Sol's group, pursuant to the contract of October 14, 1948, as approved by the court.

The business and other properties of the decedent were operated as a unit on behalf of the five purchasing heirs until March 1949, when, by contract, three of them took certain assets, leaving the remainder of property, subject to debts, in the hands of the two remaining children, Sol Cury and Ann Cury Romanus. In June 1949, D. Cury's, Incorporated, was dissolved, and its assets were distributed to Sol and Ann, the sole stockholders at that time, in accordance with an agreement between them.

The cases before us resolve themselves into the following major controversies: (1) Deficiencies in income tax, including additions for fraud, asserted against the estates of Dahar and Elizabeth Cury with respect to the years 1941 to 1944, inclusive. (2) Deficiencies in income tax, including additions for fraud, against the estate of Dahar Cury with respect to the years 1945 to 1947, inclusive, and the period from January 1, 1948, to February 7, 1948. (3) Transferee proceedings against the ten children with respect to Elizabeth's liability for deficiencies in income tax for the years 1941 to 1944, inclusive, to the extent of distributions received by them from the estate of Elizabeth. (4) Transferee proceedings against the ten children with respect to Dahar's liability for deficiencies in income tax for the years 1941 to 1947, inclusive, and the period from January 1, 1948, to February 7, 1948, to the extent of alleged distributions from his estate. (5) Deficiency in estate tax liability with respect to the estate of Dahar Cury. (6) Deficiencies in income tax, including additions for fraud, asserted against D. Cury's, Incorporated, for the fiscal years ended July 31, 1947, and July 31, 1948. (7) Transferee proceedings against Sol and Ann with respect to the income tax liability of D. Cury's, Incorporated, for the fiscal years ended July 31, 1947, and July 31, 1948. (8) Deficiencies in income tax for 1948 asserted against the five selling heirs (the George L. Cury group) in which the principal issue is the basis to be allocated to the portion of Dahar's estate sold by each of them for $55,000. (An additional issue is present in George's case involving the basis of his 10 per cent interest in D. Cury's, Incorporated, which was also sold as part of the over-all settlement of the 1948 litigation.)

(1) and (2). *Deficiencies in income tax, including additions for fraud, asserted against the estates of Dahar and Elizabeth Cury with respect to the years 1941 to 1944, inclusive, and against the estate of Dahar Cury with respect to the years 1945 to 1947, inclusive, and the period from January 1, 1948, to February 7, 1948.*

The asserted deficiencies referred to above were determined by computing the increase in net worth of Dahar Cury and Elizabeth Cury for each of the years 1941–1944, and the increase in net worth of Dahar Cury for each of the years 1945–1947 and the period from January 1, 1948, to February 7, 1948, adding thereto expenditures or losses which are nondeductible for tax purposes, thus arriving at amounts purporting to be net income for each of the taxable years.[4] The petitioners contest the propriety of resorting to that method in the circumstances present here. Their argument is that section 41 of the Internal Revenue Code of 1939 precludes the Commissioner from the use of the net worth method where the taxpayer has books and records utilizing a method of accounting and that method clearly reflects his income. Such conditions exist, contend the petitioners, in the instant case. We do not agree that the use of the net worth method is foreclosed here by section 41.

While it is true that certain books and records were kept, inventory records, which are of crucial importance in determining income in a department store business, were unavailable. Despite requests made by the special agent who conducted the investigation, no such records were turned over to him, and the only detailed inventory maintained by the business which was presented to the Court was an incomplete inventory as of January 1, 1941. There was some testimony concerning the keeping of inventory records but we are left in the dark as to how complete or accurate such records may have been, and we were given no convincing explanation for their unavailability. Moreover, other evidence before us is persuasive that the inventory figures appearing in the returns were false. In the circumstances, we do not have before us a set of books of such character as would afford the basis for confidently determining net income without resort to extrinsic evidence. It is quite true that there was evidence, presented by the Government, based upon an inventory taken by fire adjusters, from which we were able to compute inventories for each of the critical dates. But this fact can hardly operate to prevent a determination of net income by the net worth method in the circumstances of this case, where the inventory records are in fact missing and the

---

[4] The respondent allowed an additional offset against the amounts thus determined for nonbusiness deductions, in some cases using in lieu of amounts claimed on the tax returns, the allowable optional standard deduction. No explanation is given for such an allowance, but Exhibit 46–TT, stipulated by the parties, contemplates such an adjustment. But cf. *Michael Potson*, 22 T. C. 912, 927, footnote 1.

situation with respect to the inventories is highly persuasive of the existence of fraud.

In any event, even if all the inventory records were present, the use of the net worth method would not be foreclosed by section 41. Section 41, to the extent pertinent here, provides that net income shall be computed in accordance with the "method of accounting" regularly employed by the taxpayer in keeping his books, but if no such method has been employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. These provisions deal merely with *methods of accounting*. Thus, if a taxpayer keeps his books on the cash basis, and if that method clearly reflects his income, the Commissioner may not compute the income by another method of accounting. Or, if the taxpayer keeps his books on the cash basis, and if that method does not clearly reflect his income (as, for example, in cases where inventories are a factor), then the Commissioner may require the income to be computed by a different method of accounting, such as the accrual method. But there is nothing in section 41 that prevents the Commissioner from showing, by any kind of competent evidence, that a taxpayer's income has been falsely reported, regardless of the method of accounting employed.

It is quite possible that a taxpayer may have a complete set of books and may employ a method of accounting which is capable of accurately reflecting the taxpayer's income. Yet, if false or incorrect entries are made in such books—such as overstated purchases, understated sales, overstated expenses, and the like—it is plain that the income determined from the books would not be the taxpayer's true income. Furthermore, there may be almost countless ways in which incorrect entries may be made in an otherwise complete and suitable set of books, and it may therefore be difficult, if not impossible, to pinpoint the particular entry or entries that are incorrect or false. But section 41 in no way operates as a bar to foreclose the Commissioner from showing that the end result is incorrect or false. And one way of demonstrating that such a situation exists is to show that the taxpayer's increase in net worth and his nondeductible expenditures during the period in question are substantially in excess of the income appearing on his books, and that such excess cannot reasonably be explained as coming from gifts or other nontaxable sources. This, in essence, is the so-called net worth method. It is not a method of accounting at all. As we stated in *Estate of W. D. Bartlett,* 22 T. C. 1228, 1230:

the net worth method is not a system of accounting such as is referred to in section 41 of the Internal Revenue Code of 1939; it is merely evidence of income.

See *Morris Lipsitz,* 21 T. C. 917. Even where the taxpayer presents a set of books that appear superficially adequate, the application of the net worth method may show such a substantial variance with the reported income as to suggest the untrustworthiness of the books. * * *

In *Morris Lipsitz,* 21 T. C. 917, 931, we said:

when the increase in net worth is greater than that reported on a taxpayer's returns or is inconsistent with such books or records as are maintained by him, the net worth method is cogent evidence that there is unreported income or that the books and records are inadequate, inaccurate, or false. It is not correct to say that the use of the net worth method is forbidden where the taxpayer presents books from which income can be computed, for the net worth method itself may provide strong evidence that the books are unreliable. * * *

No taxpayer is permitted under section 41 to keep books on a "net worth basis," nor is the Commissioner empowered by section 41 to require that a taxpayer keep his books on that basis. The net worth method is merely a method of marshaling evidence to show that the amount of income actually realized was in fact greater than disclosed by the entries made in the taxpayer's books. Nothing in section 41 precludes the use of such evidence, provided that it is otherwise competent. And where the employment of the net worth method reveals a substantial gap between reported income and the increase in net worth, the latter may be taken as a guide for determining the amount of income actually received. Such is the plain import of the *Bartlett* and *Lipsitz* cases. Cf. *Michael Potson,* 22 T. C. 912, 927; *H. A. Hurley,* 22 T. C. 1256, 1261.

In the instant case, many of the items necessary in using the net worth method have been stipulated. Evidence was introduced as to contested items and we have made findings accordingly. The amounts of net income shown in our findings were arrived at by using the net worth method and the disparity between such amounts and the amounts reported as income was convincing evidence as to the inaccuracy of the latter. On any theory, this case is a proper one in which to use the net worth method.

In the application of the net worth method to the instant controversy, certain problems arise. The disputed items, to a large extent, present questions of fact resolved by our findings, which are based not only upon observation of the witnesses as they testified, but also upon a careful study of the entire voluminous record. It would serve no useful purpose to analyze such findings in detail here, but we shall comment upon some of the items.

*Inventories.* A major dispute between the parties, and one that is involved in many of the issues presented, concerns the valuation of inventories of the stores operated first by Dahar Cury, as a sole

proprietorship, and later, by the corporation, D. Cury's, Incorporated. No records of inventories for the years involved were introduced into evidence, except one purporting to be a record of the inventory as of January 1, 1941, of the three stores then owned by Dahar Cury. And that record was incomplete in that it did not contain any detailed itemizations of inventory for one of those stores.

It was necessary then to reconstruct, in some manner, inventories for the beginning and end of each of the taxable periods involved. This was made possible by the fortuitous occurrence of a fire at the Norton store on July 2, 1948, which was followed by the taking of a careful inventory at that store by insurance adjusters in connection with the determination of the amount of the loss which was covered by insurance. The respondent has used the inventory taken by the insurance adjusters as a starting point and by a series of computations has arrived at inventory valuations for the beginning and end of each of the taxable periods.

Counsel for at least one group of petitioners before us recognize the necessity of reconstructing the inventories, and indeed, on brief, "urge this Court to utilize the method advocated by Respondent as one basis for the determination of inventories." However, counsel attack the reconstruction made by the respondent, in that they urge that he has applied his method in an unfair manner to the facts of this case by failing to make certain adjustments that would operate in petitioners' favor. We think that petitioners are justified in large part in their criticisms of respondent's reconstruction, and have taken them into account in making our own findings. For example, the so-called inventory as of July 2, 1948, for the Norton store included "warehouse" merchandise being held not only for the Norton store but also for the branch stores.[5] The respondent's reconstruction eliminated only the merchandise in the receiving department applicable to the Norton store; he failed to make a corresponding adjustment for a portion of the goods kept on the upper (storage) floors of the Norton store, which, we are persuaded, were similarly being held as supplies for both the Norton and branch stores. Our findings have given appropriate weight to this factor. Again, petitioners complain that the inventory was computed at cost, without allowance for any decline in market value below cost by reason of obsolete or damaged goods. We have taken this factor into account in making our findings. Petitioners also urge that respondent erroneously treated the July 2, 1948, inventory as the basis for determining the July 31, 1948, inventory,

---

[5] It was necessary to determine the inventory of the Norton store separately, so that by comparing gross sales of the Norton store with those of the branch stores, a basis could be obatined for determining the inventories of the branch stores.

**336**

without giving appropriate consideration to the events occurring between July 2 and July 31, 1948. We think that much of this criticism is warranted.[6] After giving due weight to these and other adjustments required by the evidence, and adopting in substance the method employed by respondent, which, as already noted, was approved by counsel for some of the petitioners herein, we have made findings as to inventories reflecting the various factors involved.

*Undeposited cash.* Petitioners contend that Elizabeth Haddad Cury, the wife of Dahar, had in excess of $30,000 in cash on hand on January 1, 1941. The respondent has refused to allow credit for such cash in any amount. When Elizabeth died early in 1945, $23,640 was found in her safe-deposit box. We were presented with credible evidence that Elizabeth was a frugal woman, that she saved money over the years out of her household allowance, and that she had income from certain real estate which she likewise saved. She also had purchased some war bonds after January 1, 1941.[7] Although we do not believe that she had as much as $30,000 on January 1, 1941, we are satisfied that she had a substantial amount at that time, which in our best judgment, was the same as the amount found in her box at her death, namely, $23,640. To the extent that she saved money between January 1, 1941, and the date of her death, such savings, in our judgment, are reflected in the war bonds which she purchased.

*Family and personal living expenses.* It is plain that some amounts were spent each year for family and personal living expenses. We had no direct evidence of the precise amounts involved. However, we know the size of the family generally from the record, and some index of the scale of living is furnished by evidence as to automobiles. The evidence suggests that there were at least several automobiles in the family. It is our best judgment, on the record, that the living and family expenses determined by the respondent are generally rea-

---

[6] A fire sale was conducted, with the result that the Norton store had sales in the amount of $38,574.99 during July 1948. Respondent attempts to justify ignoring these sales on the ground that they, and other adjustments sought by petitioners for the period from July 2 to July 31, 1948, were more than offset by purchases in the amount of $103,206.69 during July 1948, which he similarly ignored. But we are satisfied on the evidence that such purchases do not in fact represent in their entirety merchandise received during July. The evidence was that the business took up to 90 days to pay for its goods, and that after the fire it canceled orders or postponed deliveries of merchandise on order. We are satisfied that although part of that merchandise was delivered during July, a substantial portion of the $103,206.69 represented merchandise delivered prior to July and already reflected in the fire inventory. And, of course, as to the merchandise delivered during July, only a portion was applicable to the Norton store, the remainder being held for or delivered to the branch stores.

In making our findings we have given full weight to all events occurring between July 2 and July 31, 1948, including an adjustment for the $64,121.17 loss due to the fire itself.

[7] The purchase of these bonds is reflected in the stipulated facts which we have incorporated in our findings by reference.

sonable, and, except for one year (1947),[8] we have accepted them in making our findings.

*Educational expenses of Dahar Cury, Jr., Ruth Cury, and Robert Cury.* We are satisfied on the record that the amounts attributed by respondent to this item are excessive. However, we cannot accept at face the testimony of each of these three persons as to what amounts were actually expended. Taking into account the credibility of the witnesses and the circumstances of record surrounding their education and support, we have made findings as to the amounts which, in our best judgment, were expended on their behalf by their father.

*Gifts to George L. Cury.* The respondent's net worth statement charged $19,075 to Dahar Cury as representing gifts made by Dahar to his son George in 1947. Of that amount $4,075 relates to part of the purchase price of a house acquired by George in 1947. We have no convincing evidence that Dahar made any such gift to George. As to the remaining $15,000, we have no evidence whatever that any such gift was made in 1947. In the circumstances, this item must be eliminated.

*Gifts to children of United States Government Bonds.* The evidence does not support the full amount of expenditures which respondent has attributed to Dahar and Elizabeth representing gifts of war bonds to their children. The evidence does show, and we have found as a fact, that a bond was purchased in the name of Ann Cury Romanus at a cost of $375 with funds belonging to Elizabeth in 1944; that Dahar spent $375 in purchasing such bonds for Ruth in 1945; and, also, that in 1945 Dahar purchased such bonds at a total cost of $3,000 for Robert. However, of the amount spent for Robert's bonds, some portion represented part of Robert's Army pay which he had sent home, and we have found that portion to be $500, thus leaving a net expenditure of $2,500 by Dahar on behalf of Robert. Accordingly, the only gifts of war bonds made by Dahar and Elizabeth to their children were $375 in 1944 and gifts in the aggregate amount of $2,875 during the year 1945.

*Fraud.* We have made a finding that a part of the deficiencies for each of the taxable years 1941 to 1947, inclusive, and the period from January 1, 1948, to February 7, 1948, is due to fraud with intent to evade tax. Such finding we think is supported by clear and convincing evidence.

[8] Except for 1947, the living and personal expenses determined by respondent were in rounded figures: $4,200 for 1941, $4,500 for each of the years 1942–1945, $5,000 for 1946, and $7,382.30 for 1947. We are wholly without information as to the unusual figure for 1947, and have not been told why there was such a marked increase over 1946. Taking into account the general increase in cost of living during the postwar period, we have found as a fact that the family and personal living expenses for 1947 were $6,000.

The inventories for the Cury enterprise were persistently false; as a result, the income of the business was also understated. The differences between income reported and what we have found to be the correct income are substantial. Except for an incomplete inventory as of January 1, 1941, no inventory records maintained by the business were produced at the trial and their absence has not been satisfactorily explained.[9] In the circumstances, we think that the respondent has established by clear and convincing evidence that the deficiencies were due, at least in part, to fraud. Accordingly, the statute of limitations has not run on any of the years involved.

(3) *Transferee proceedings against the children of Dahar and Elizabeth with respect to Elizabeth's liability for deficiencies in income tax for the years 1941 to 1944, inclusive, to the extent of distributions received by them from the estate of Elizabeth.*

At the trial, counsel for all of the petitioners represented in these transferee cases have admitted transferee liability to the extent of $2,963.48 each if there are any deficiencies in the tax of the transferor. We have decided above that there are such deficiencies. Accordingly, transferee liability with respect to the deficiencies against Elizabeth's estate has been established.

(4) *Transferee proceedings against the children of Dahar with respect to Dahar's liability for deficiencies in income tax for the years 1941 to 1947, inclusive, and the period from January 1, 1948, to February 7, 1948, to the extent of distributions from his estate.*

Petitioners Sol W. Cury and Ann Cury Romanus agree that they are liable for Dahar Cury's income tax as transferees of assets of the estate of Dahar Cury if there are any deficiencies in such taxes. Petitioners George L. Cury, Dahar Cury, Jr., Robert Cury, Neal Gene Cury, and Ruth Cury however contend that they received no assets of the estate of Dahar Cury and therefore cannot be held liable as transferees. We do not agree.

The order entered by the Virginia court on November 17, 1948, provided for the immediate vesting of Dahar's entire estate, equally and jointly, in the ten children, and it decreed that each of them was then the owner, "absolutely and in fee simple," of a one-tenth undivided interest in the estate. The five selling heirs promptly undertook to deal with their interests, and, pursuant to the contract of October 14, 1948, sold their interests to the other five heirs. The estate of Dahar Cury, as such, ceased to have any property. When the administrators were thereafter appointed they had no assets to administer, the court order of November 17, 1948, having effectively disposed of the

---

[9] Sol W. Cury testified that the records were not turned over to him when his group acquired control of the business. George L. Cury testified that the records were left with the business and were not in his possession.

assets to the ten children. There was just as complete a distribution of the estate to the ten children on November 17, 1948, as would have been the case had each of them physically received assets of the estate worth one-tenth of its total value. The estate was then stripped of all assets and unable to pay its debts, including Federal taxes. All ten children were transferees of the estate, each in the amount of one-tenth of its total value, and each is therefore liable as transferee to that extent.

The fact that the five members of George's group promptly sold the assets thus transferred to them is an immaterial consideration. Does a transferee cease to be such by selling the transferred property 5 years later? One year later? One day later? Or even on the same day? We think not. The price at which he may sell the property is not the measure of his liability. His liability is measured by the value of the property that was transferred to him.[10]

The mere fact that the five purchasing heirs may have assumed contractually all liability for the taxes of the transferor cannot relieve the five selling heirs of their transferee liability when the Government seeks to collect the taxes due from the estate. Such liability cannot be contracted away. The rights of the various transferees *inter sese* are irrelevant when transferee liability is asserted against one of them. *Phillips* v. *Commissioner*, 283 U. S. 589, 604. The transferees held accountable may thereafter successfully seek contribution from other transferees (cf. *Phillips-Jones Corp.* v. *Parmley*, 302 U. S. 233), or indeed complete reimbursement if local law or contractual rights justify such result. But the existence of such rights among the transferees cannot prevent the assertion of transferee liability against any one of them to the extent of property received by him, where the result of the distribution is to leave the taxpayer without assets to meet its obligations. *Phillips* v. *Commissioner, supra.* Such was the situation here, since the estate was left without assets as a result of the decree of November 17, 1948, and we can find no escape from the conclusion

[10] The same five petitioners (members of George's group) contend that the respondent has not established the value of the assets received by them. This value is susceptible of computation. The value of the estate of Dahar Cury is also in issue for estate tax purposes, and it will be determined pursuant to the decision herein. There is no dispute between the parties that such value, when determined, is to be used to compute the basis of the one-tenth interest of each of the members of George's group in establishing the amount of gain, if any, realized by them on the sale of their interests at $55,000 each, and the same valuation can be used as a basis for the determination of the value of the assets received by each of the ten children for purposes of transferee liability. In view of earnings realized and undistributed by the corporation during the period from February 7 to November 17, 1948, and in view of rents accruing on the real estate during that same period, we are satisfied on the record that the value of the assets transferred to the ten children on November 17, 1948, was no less than the value of such assets as of February 7, 1948, the date of death. But since the burden of proof is upon the respondent in transferee cases to establish the value of the assets transferred, and since respondent has not established how much higher the value of the assets should be as of November 17, 1948, the transferees cannot be charged with transferee liability measured by any value in excess of the value as of February 7, 1948.

that each of the five members of George's group is liable as a transferee, regardless of any possible rights of reimbursement that he may subsequently assert against any or all of the other five children.

Petitioner A. B. Cury submitted a brief contesting his liability as a transferee of assets of the estate of his father. What we have said above in regard to the arguments of the George L. Cury groups applies similarly to the contentions made by him.

(5) *Deficiency in estate tax liability with respect to the estate of Dahar Cury.*

The respondent determined the deficiency in estate tax by computing a valuation based on the $55,000 contract price at which each of the children in George's group sold his one-tenth interest to the children in Sol's group. The Government did not undertake to value the estate by valuing the various items of property constituting the estate. However, the parties have stipulated the fair market value of most of the assets includible in the gross estate as of the date of Dahar Cury's death. The only items not so stipulated are the decedent's real estate and the 900 shares of stock in D. Cury's, Incorporated, owned by the decedent at his death.

The administrators contend that although the estate can be valued by the method employed by the respondent, the more proper method in the circumstances of this case would be to value the individual assets of the estate. We agree with the administrators.

As to the real estate, we are satisfied on the evidence that the value reported in the estate tax returns, namely, $247,880.41, was the correct fair market value of the real estate (including accrued rent) owned by the decedent on the date of his death, and we have so found as a fact.

As to the stock, the administrators appear to be in agreement with the Government that the method used by the Government on brief to determine the fair market value of the stock of D. Cury's, Incorporated, is a proper one. In order to determine this fair market value, the Government made a computation of the book value of the assets of the corporation on July 31, 1947, adjusting the asset values to reflect the inventory figure contended for by the Government, and adding to the book value so determined, earnings prorated for the period from August 1, 1947, to February 7, 1948.

In criticizing respondent's computations the administrators first point out that the proper adjustment for inventory value is the value to be found by this Court, and not the one urged by respondent. We agree. Petitioners next urge that liabilities should be increased by the amount of corporate tax liability for the fiscal year ended July 31, 1947, as determined in these proceedings, in order to reflect accurately the book value of the stock. We agree that this adjustment is also a proper one.

The administrators next contend that the amount of earnings for the period from August 1, 1947, to February 7, 1948, as contended for by respondent, should be adjusted to reflect our findings in these proceedings. We think they are also correct in this objection to respondent's computation. The correct earnings and tax liability of the corporation for the fiscal year ended July 31, 1948, will be determined under Rule 50. The amounts so arrived at can be used in accordance with respondent's method to compute the prorata part of such earnings from the beginning of the fiscal year to the date of Dahar Cury's death. All such computations can be made under Rule 50.

The respondent, on brief, does not contest the various deductions sought by petitioners in computing the net estate, and they can be taken into account in the computations under Rule 50.

(6) *Deficiencies in income tax, including additions for fraud asserted against D. Cury's, Incorporated, for the fiscal years ended July 31, 1947, and July 31, 1948.*

The only errors alleged by petitioner D. Cury's, Incorporated, are (a) that the inventories determined by the respondent were incorrect, and (b) that any resulting deficiencies were due to fraud with intent to evade tax. We have made findings of fact concerning the inventories of the corporation and what we have said above as to the determination of inventories applies here as well. The inventory figures appearing in the returns were false, and we are satisfied on the record that the deficiencies are due, in part at least, to fraud. We think that the gross understatement of inventories and resulting understatement of income have been shown clearly to be due to more than the honest conservatism of a business man, as contended by petitioners. The evidence that such understatements were due to fraud is convincing and we have so found.

(7) *Transferee proceedings against Sol W. Cury and Ann Cury Romanus with respect to income tax liability of D. Cury's, Incorporated, for the fiscal years ended July 31, 1947, and July 31, 1948.*

Petitioners Sol W. Cury and Ann Cury Romanus concede that they are liable as transferees of assets of D. Cury's, Incorporated, if there are taxes due from the corporation. They contend and respondent agrees, on brief, that certain assets received in the estate distribution, on the liquidation of the corporation, are not includible in the valuation of assets which were transferred to them by the corporation. The parties are also in agreement that the value of the assets received must be adjusted to reflect the correct inventories on June 30, 1949.

There appears to be only one dispute between the parties on this issue. This concerns whether the amount of $130,000 appearing in the "Proof of Transactions, June 30, 1949" as estate tax liability was a

contingent or fixed liability. Respondent contends that it was contingent and should not be taken into account in determining the value of assets received by the petitioners. We do not agree. The liability was one which the petitioners had obligated themselves to discharge. Moreover, those corporate assets (real estate) which had previously been part of the assets of Dahar Cury's estate were subject to a lien for such taxes. Sec. 827 (a), I. R. C., 1939. In the circumstances, we think that the liability must be regarded as fixed and can be taken into account in computing the value of the assets transferred to the petitioners.

(8) *Deficiencies in income tax for 1948 asserted against the five selling heirs (the George L. Cury group) involving principally the basis to be allocated to the portions of Dahar Cury's estate sold by them.*

There is no real dispute between the parties on this issue. The deficiencies were determined, as a protective measure, by allowing a zero basis for the interests in Dahar Cury's estate owned by these heirs. Respondent and these petitioners agree that the basis for a one-tenth interest in the estate should be one-tenth of the value of the estate. This is to be determined in accordance with our findings and Opinion above.

One other issue is present in the case of the deficiency determined against George L. Cury. It involves his basis for the 100 shares of stock owned by him and sold to the Sol W. Cury group. We have found that his basis for the stock was $5,500. He gave a $5,500 check therefor, and there is no satisfactory evidence before us that he paid anything more, out of his own funds, for the stock. Accordingly, his basis cannot be in excess of $5,500.

*Decisions in all dockets will be entered under Rule 50.*