Oscar Olson v. Commissioner. Oscar Olson and Myrtle Olson v. Commissioner.
Olson v. Commissioner
Docket Nos. 49869, 49870.
United States Tax Court
T.C. Memo 1955-222; 1955 Tax Ct. Memo LEXIS 115; 14 T.C.M. (CCH) 886; T.C.M. (RIA) 55222; August 9, 1955
*115 1. Petitioner was the proprietor of a retail jewelry store during the taxable years 1939 through 1948. He also engaged in various other activities during some or all of the taxable years, including investing in real estate, securities, and a bulk oil business, and speculating in loose diamonds, commodities, and securities. The records of the store did not clearly reflect its income and expenses and petitioner maintained no system of accounting with respect to his investments and speculations. Held, that net income was properly determined by use of the increase in net worth plus nondeductible expenditures method. Held further, that there is a deficiency in income tax for each of the taxable years due in part in each year to fraud with intent to evade the tax. 2. Held, that petitioners have established that the late filing of their 1948 return was due to reasonable cause and not to wilful neglect. Marion Hirschburg, Esq., 300 1/2 Main Street, Ames, Ia., for the petitioners. Thomas A. Steele, Jr., Esq., for the respondent. FISHER
Memorandum Findings *116 of Fact and Opinion Respondent determined deficiencies in income tax and fraud penalties against petitioner Oscar Olson for the taxable years 1939 through 1947, as follows: Sec. 293(b)
Year
Deficiency
Penalty
1939
$ 1,790.69
$ 918.71
1940
5,643.92
2,821.96
1941
8,369.15
4,184.58
1942
7,245.41
3,622.71
1943
54,179.50
26,760.40
1944
38,275.03
19,137.52
1945
70,675.63
36,081.15
1946
52,143.41
26,071.71
1947
70,263.11
35,131.56
*117 Respondent also determined deficiencies in income tax, fraud penalties, and delinquency penalties against both petitioners for the taxable year 1948 as follows: Sec. 293(b)
Sec. 291(a)
Deficiency
Penalty
Penalty
$18,294.60
$9,147.30
$4,573.65
The principal issues involved in the case are whether respondent properly resorted to the net worth plus expenditures method of determining net income, whether there were deficiencies due in part to fraud with intent to evade income taxes, and whether petitioners' failure to file a timely return for 1948 was due to reasonable cause and not due to wilful neglect. Findings of Fact Some of the facts were stipulated by the parties, both orally and in writing. Those facts so stipulated are found accordingly and incorporated herein by this reference. For the taxable years 1939, 1944, and 1948, petitioners filed joint returns. For the other taxable years in issue, Oscar Olson, hereinafter sometimes referred to as petitioner, filed separate returns. All such returns were filed with the collector of internal revenue for the district of Iowa. Oscar Olson was born in Sweden on April 11, 1896. He was brought to this *118 country at the age of four years by his mother, then a widow. He was accompanied by his older brother and two sisters. Upon arrival in the United States, the family went to Marcus, Iowa, and made their home with the mother's parents and brothers, the mother keeping house for the entire group. Several years later the entire group moved to Fort Dodge, Iowa. Thereafter, petitioner's mother remarried, but he continued to live with her until his own marriage in 1922. Petitioner attended high school in Fort Dodge, Iowa, graduating therefrom in 1916 at the age of 20 years. His schooling was retarded partly because he was absent from school for approximately one year while serving an apprenticeship with a local jeweler, Mack A. Hurlburt. Thereafter, while attending high school, he continued the apprenticeship on Saturdays, evenings, and after school hours. He was taught jewelry manufacturing and the evaluation of diamonds by Hurlburt during the course of the apprenticeship. After graduating from high school, petitioner continued to work for Hurlburt. He also started to speculate and trade in loose diamonds. This trading was done before petitioner's induction into the Army in 1918 and after *119 his discharge from the Army in 1919, and was performed in part under the guidance of Hurlburt. While he was in the armed services, petitioner sold single diamonds to other servicemen stationed at Camp Dodge, Iowa, and he bought stones in Bordeaux, France, before being shipped back to the United States for discharge. Thereafter, petitioner returned to work for Hurlburt and continued in such employment until 1921. In that year, petitioner and J. Merrill Inch, another of Hurlburt's employees, formed an equal partnership to purchase and operate a jewelry store in Fort Dodge, Iowa. The store was purchased from one Otto Fessler. Each partner put about $12,000 into the business. Inch contributed $5,000 in cash and a land contract on a house, and Olson put in cash and loose diamonds. The partnership operated for about two years until petitioner bought out Inch's interest. Petitioner paid Inch $6,000 cash and some property, and assumed the store's bills. The property consisted of lots then valued by Inch at $7,500. While the Inch and Olson partnership was in existence, petitioner speculated in loose diamonds and other investments and spent very little time on the store operation. Petitioner's *120 speculations were in his individual right and not for the benefit of the partnership. His diamond speculations were conducted in Fort Dodge, Chicago, and New York through his individual efforts and the efforts of salesmen and brokers working on commission. These diamond transactions were consummated on the basis of cash or treasury bonds. Petitioner's failure to devote much time to the store operation was the cause of the dissolution of the partnership. After Olson purchased Inch's partnership interest in the store, Inch remained in his employ for about three years. The store was operated under the name of Inch and Olson until the early 1930's, at which time the name Inch was dropped. Petitioner Myrtle Olson was born in Holdredge, Nebraska. She and Oscar Olson were married in 1922. At the time of the marriage, Olson was in partnership with J. Merrill Inch as stated above. Petitioners have two children, Donna Rae born in 1927 and Lois Joan born in 1929. During the 1920's, petitioner speculated in diamonds, commodities, and stocks. He was an active trader on the Board of Trade. Prior to the depression, however, he ceased his diamond speculations and started to close out his brokerage *121 accounts. At that time, he was maintaining only one bank account and he deposited therein funds received from the retail jewelry store as well as from his other business enterprises, including diamond speculations and brokerage accounts. On May 19, 1930, petitioner deposited in that account $101,611.95 which consisted of funds received by him when he closed out his brokerage accounts. He subsequently resumed his speculative trading in the diamond and commodity markets, and he engaged in such activities during some of the taxable years. In early 1949, petitioner exhibited to revenue agents who were then investigating his affairs a bag containing 29 loose diamonds. These diamonds had total bases to petitioner for tax purposes of $10,000. They had been acquired by him prior to December 31, 1948. In 1936 and 1937, petitioner made loans in the total amount of $85,423 to various diamond dealers. These loans were secured by loose diamonds. At the end of 1938, such diamond loans in the total amount of $81,523 were outstanding. During the taxable years, these loans were repaid as reflected in the schedule below, plus interest in various amounts. The interest payments were not reported *122 in the tax returns for the pertinent years. The following schedule states the principal sum of such loans outstanding on December 31 of each of the years in question: 1939
$81,523
1944
$50,423
1940
81,023
1945
40,423
1941
81,023
1946
21,623
1942
72,523
1947
0
1943
55,623
1948
0
Prior to 1941, petitioner kept some cash, diamonds, and bonds in the safes in his retail jewelry store. On November 24, 1941, at his wife's urging, Olson rented a large safety deposit box at the Fort Dodge National Bank, Fort Dodge, Iowa. Thereafter, during the years involved herein, petitioner entered the box about 90 times. On March 20, 1945, petitioner Myrtle Olson also rented a safety deposit box from the Fort Dodge National Bank which she thereafter entered four times during the taxable years. After 1940, petitioner began to invest his funds in real estate. During 1941 he acquired a land contract, a retail oil station, and an oil bulk plant. He purchased the oil properties for the purpose of going into the distribution of gasoline and oil in the territory around Fort Dodge, Iowa, the business to be operated by his brother-in-law, Tom C. Ward, who was experienced *123 in this particular business. After acquiring the oil bulk plant, Olson and Ward handled the Pure Oil Company line of products. The original operation was primarily a jobber type. Subsequently, however, they became interested in setting up retail outlets, and they spent considerable time seeking appropriate sites for the erection of filling stations. Two or three sites were located and petitioner made an offer on one of them. Had all sites been acquired and stations erected thereon, the total expenditure would have been about $100,000. The Pure Oil Company representative informed petitioner that his company would advance two-thirds of any amount needed, but Olson informed him that he was not interested in any such financing. The expansion plan was abandoned, however, due to building restrictions imposed as a result of the outbreak of World War II. Petitioner also acquired three farms, two in 1943 and one in 1944. The farm acquired in 1944 was in the name of his wife. Petitioner managed one farm for a part of 1943 but he subsequently turned it and the other farms over to a farm management concern. This concern made financial reports to him for the years 1944 through 1948. Petitioner *124 acquired a piece of real estate known as the 914 Central Avenue Building in 1943. Management of the property was turned over to a firm in Fort Dodge, Iowa, which made financial reports to the Olsons. In 1946, Olson deeded one-half of this property to his wife, and in 1948 petitioners each deeded one-half of their individual interests to their two daughters. During the years 1943 through 1948, the Olson family, including the two daughters, acquired various shares of common stocks and certificates of investment in Investors Mutual. At the end of 1948, they owned 7,400 shares of stock of 128 different corporations. During these years, members of the Olson family received dividends in the following amounts: 1943
1944
1945
1946
1947
1948
Oscar Olson
$152.64
$636.08
$1,261.42
$3,124.18
$4,445.04
$5,262.53
Myrtle Olson
2.50
577.33
629.41
829.60
Lois Joan Olson
6.36
6.36
44.75
861.01
943.35
1,218.26
Donna Rae Olson
6.00
6.00
44.39
940.65
1,047.99
1,407.90
$165.00
$648.44
$1,353.06
$5,503.17
$7,065.79
$8,718.29
Petitioner's income tax return for 1943 reported no income from dividends. Those for the years 1944 to *125 1948, inclusive, reported dividend income in the respective amounts of $325, $347.30, $740, $825.50 and $4,688.60. During 1946, 1947 and 1948, petitioner bought some of the above-mentioned securities in his own name and charged the cost thereof to his jewelry store merchandise records. These items were not added back to the closing inventory at the end of each year. Petitioner personally made all such entries in the merchandise accounts and he knew that by including his personal purchases during a given year with his jewelry store merchandise he would thereby reduce his income tax for that year unless he also included the same purchases in that year's closing inventory as an offset. In 1941, petitioner had a capital gain in the amount of $206.33 in connection with the sale of a house. In 1945, he had a capital gain in the amount of $593.46 in connection with the sale of certain treasury bonds. In 1947, he had a capital gain in the amount of $2,750 in connection with the sale of a house. Petitioner did not report these gains in the returns for those years. In 1943, 1944 and 1945, petitioner received interest from Government Bonds as follows: $1,258 in 1943, $450 in 1944, and $409.43 *126 paid to him through brokers in 1945. Olson reported only portions thereof on his tax returns for those years. A portion of the interest received in 1943, however, was tax exempt, the bonds involved having been acquired prior to March 1, 1941. In 1944, 1945, 1946, 1947, and 1948, petitioner received rents for a certain warehouse from the Wilbur Vault Company in the respective amounts of $80, $480, $480, $480, and $580. He did not report these amounts as income and he made no deduction on his returns for those years for taxes, expenses, or depreciation pertaining to said property. During 1941 through 1947, petitioner received rents from Tom C. Ward for a house and for the oil station and bulk plant mentioned above. He did not report this income in his returns for those years. He also made no deductions on those returns for taxes, expenses, or depreciation pertaining to the properties. The rents and expenses on these properties for the year 1948 were duly reported. During 1943 through 1947, petitioner received rents from one Farris for a rental house and failed to report this income on his returns for those years. He also made no deductions therein for taxes, expenses and depreciation *127 pertaining to the property. During the years 1940 through 1948, petitioner received interest on various loans to Fred Alstrand, Tom C. Ward, and on a land contract. Some of these interest items were not reported in petitioner's returns for those years. Petitioner kept no records pertaining thereto. During the years 1942, 1945, 1946, and 1947, petitioner had profits and losses in connection with his speculations in stocks and commodities. He failed to report these items in his returns for those years. On his income tax returns filed for the calendar years 1939 through 1942 petitioner claimed interest deductions (on business indebtedness) in the respective amounts of $1,852.57, $2,244.93, $1,466.28 and $890.76. During those years, however, petitioner's total outstanding indebtedness consisted of the following: (a) A loan of $10,000 made on October 12, 1938, and repaid $5,000 on March 20, 1939, and $5,000 on June 16, 1939; (b) A loan of $1,000 made on July 27, 1939, which was repaid in full on August 11, 1939; (c) A loan of $7,500 made on January 9, 1940, which was repaid in full on January 13, 1940; (d) A loan of $5,000 made on December 29, 1941, which was repaid $2,500 *128 on December 30, 1941, $500 on December 31, 1941, $2,000 on January 2, 1942. Petitioner devoted very little time to his retail jewelry store during the taxable years. He spent a great deal of his time on the golf course or playing pitch at the Elks Club. He usually slept late in the mornings and arrived at the store about noon. He often worked in the store in the evenings, however, after normal store hours seeing salesmen and others. During the years involved herein most retail sales were handled by employees. Sales were recorded on a sales slip by the employee making the sale. As each sale was made, whether for cash or credit, the sale slip was placed on the desk of Miss Nugent, an employee who had worked in the store for many years. Each sale was rung-up on the cash register, said register classifying the sale by departments. At the end of each business day, the sales were all totalled and a daily summary sheet was prepared based upon the cash register tape and the sales slips. These daily summary sheets were usually prepared by Miss Nugent, but petitioner prepared them on the days when Miss Nugent was absent. The front of the summary sheets showed all cash or credit sales, *129 repair work, excise tax, daily beginning cash, paid-outs, and amounts paid on account. The back of the summary sheet pertained to inventory and excise tax. After Miss Nugent prepared the daily summary sheets they were turned over to petitioner with the sales slips and cash register tapes attached thereto. He then checked the sheets against the slips and tapes and occasionally made changes. On some occasions, petitioner rewrote the summary slips. Thereafter, petitioner returned them to Miss Nugent and she entered them into the daily sales records. The books and records for the years 1940 through 1945 were not available during the investigation or hearing of the instant case. With respect to the years 1939, 1946, 1947, and 1948, however, petitioner furnished internal revenue agents with some books relating to the retail jewelry store. Such books consisted of combination journals that reflected purchases, expenses, and sales Each journal consisted of a book which opened to form double sheets. Checks issued were entered therein and allocated either to an expense column or to a merchandise column. Cash and credit sales were both entered therein and the cost of the merchandise so sold *130 was deducted out of the merchandise column, the balance then remaining being credited directly to a profit and loss column. Petitioner's system of bookkeeping was adequate, if correctly maintained, to determine income and expenses of the jewelry store. These records were not accurate, however, as indicated below. After the investigation was commenced in 1949, petitioner purposely altered his books for 1938 and 1939 by increasing accounts receivable on each page of the journals by $100,000. He made these changes so that the books for those years would reflect his estimate of the amount of outstanding diamond loans, mentioned supra, records of which had previously been misplaced by petitioner and were then unavailable for use by the investigating agents. Petitioner recorded as business expenses in the journals for the years 1946, 1947 and 1948 items of personal expense including the following: personal insurance premiums, cost of carpeting for his home, cost of his daughters' education, cost of reburying his mother, security purchases, expense of utilities used in his home, and other personal expenses. These entries were made for the purpose of reducing his Federal income taxes *131 for those years. In 1947, Internal Revenue officials performed an office audit of petitioner's income tax return for 1945. In this audit petitioner's taxable income was increased due to the disallowance of deductions claimed by petitioner for personal expenses. Prior to that, in 1940, Internal Revenue officials had audited petitioners' joint income tax return for 1939 and had increased their taxable income for similar reasons. As early as 1940, petitioner had been officially "advised" concerning such improper deductions. Sidney B. Smith, a certified public accountant employed by petitioners, made an audit of the jewelry store operations using the information available to him. The following schedule states for each of the taxable years the net profit of the business as reported by petitioner and the net profit disclosed by the audit: Reported
Net Profit
Year
Net Profit
Per Audit
1939
$ 6,688.84
$15,863.99
1940
4,543.85
13,762.75
1941
3,917.29
5,806.09
1942
5,440.02
2,928.25
1943
7,718.91
22,409.28
1944
12,875.50
11,280.81
1945
13,990.14
26,757.69
1946
15,672.48
20,586.27
1947
12,380.80
15,182.08
1948
5,816.83
4,991.49
In June *132 1949, Oscar Olson signed and submitted to respondent a detailed net worth statement showing his family's net worth as of December 31, 1947, to be $512,287.47. Under Section 145(b), Title 26, U.S. Code, Oscar Olson was charged with wilfully and knowingly attempting to evade his income taxes for the calendar years 1946 and 1947 by filing false and fraudulent returns for said years. He pleaded nolo contendere to the count for each year as contained in the Information filed on April 21, 1953. On July 2, 1953, petitioner was found guilty and sentenced to pay a fine of $10,000 and to be imprisoned for two years on each count, the terms to run concurrently. In addition to the items mentioned above and those stipulated by the parties, the following transactions, assets, and liabilities are reflected infra in Schedule A, the statement of petitioner's net worth, for the pertinent year or years involved. 1. During the taxable years, petitioner owned cash, bearer bonds, and loose diamonds. The following schedule states the total amount of those assets held by petitioner on December 31 of each of the years indicated. The amount attributable to loose diamonds in the total figure for each year *133 is the total basis for tax purposes of the diamonds then held by petitioner. 1938
$125,000
1939
116,500
1940
118,500
1941
124,500
1942
135,000
1943
$100,000
1944
98,000
1945
63,000
1946
61,000
1947
40,000
1948
20,657
No gains or losses from petitioner's dealings in loose diamonds during the taxable years were reported in his income tax returns. 2. During 1942, petitioner began to make improvements in the jewelry store. The improvements were completed in 1943 and new furniture and fixtures were then installed. Petitioner incurred expenses for improvements made during 1942 in the amount of $1,943.27 (the parties refer to this item as "Item 60"). These expenses were not paid during 1942 and constituted an account payable outstanding at the end of that year. (Petitioners refer to this item as "Item S5, Accounts Payable, Improvements"). 3. On December 31 of each of the years 1938 through 1943, the following additional amounts relating to the jewelry store business (referred to by petitioners as "Accounts Payable") were due and owing by petitioner to various creditors: 1938
$ 163.70
1939
742.04
1940
859.22
1941
3,065.97
1942
6,052.94
1943
6.97
*134 4. Petitioners purchased their own home in 1927. They lived there until 1944 when they acquired their present home which is referred to by the parties herein as "Item 62." The property was paid for in part by cashier's checks purchased by petitioner during 1943 in the amount of $6,576.85. 5. Petitioner owned Treasury Bonds (referred to by the parties herein as "Item 41") on December 31 of the years 1943 through 1946 only, in the following amounts: 1943
$ 3,500
1944
24,000
1945
13,000
1946
13,000
Petitioner's net worth, including assets of his wife and daughters acquired for them by petitioner's funds, on December 31 of each of the pertinent years involved herein is as follows: Schedule A
1938
$248,949.58
1939
265,448.23
1940
290,127.18
1941
312,081.80
1942
326,475.44
1943
362,726.27
1944
$403,313.96
1945
452,841.98
1946
508,123.06
1947
550,559.12
1948
567,345.00
During the years involved herein, Myrtle Olson made some of their two daughters' clothing and raised some garden produce for the family's table. One daughter, Donna Rae, attended Stephens College, Columbia, Missouri, for the school years 1945-1946 and 1946-1947, the *135 yearly cost being $1,175 and $1,250, respectively. She also attended Iowa University, Iowa City, Iowa, for the school years 1947-1948 and 1948-1949. The other daughter, Lois Joan, attended Stephens College for the school years 1946-1947 and 1947-1948, the yearly cost being $1,250 and $1,350, respectively. She also attended Iowa University for the school year 1948-1949. Both daughters worked as counselors while attending Stephens College. During the years in question herein, petitioners took two vacations, one in 1946 and the other in 1947. The trips were made by car and neither exceeded three weeks in duration. They have belonged to a country club since about 1941. Petitioners expended the following amounts during the taxable years for nondeductible expenses, other than personal income taxes and personal life insurance premiums (which were stipulated by the parties).. 1939
$3,000.00
1940
3,500.00
1941
4,500.00
1942
6,040.76
1943
6,500.00
1944
$ 8,000.00
1945
7,500.00
1946
9,000.00
1947
10,500.00
1948
10,500.00
The following schedule states for each of the taxable years the unreported net income of petitioner (or petitioners, for years in which *136 joint returns were filed) and information pertinent to that finding: Schedule B - Unreported Net Income
1939
1940
1941
1942
1943
Increase in Net Worth
$16,498.65
$24,678.95
$21,954.62
$14,393.64
$36,250.83
(See Schedule A, supra)
Nondeductible Expenditures *
5,518.99
6,065.72
7,047.08
8,853.24
10,724.05
Total Income
22,017.64
30,744.67
29,001.70
23,246.88
46,974.88
Nontaxable Income and Additional
Deductions **
483.69
Total Net Income
22,017.64
30,744.67
29,001.70
23,246.88
46,491.19
Reported Net Income ***
4,768.17
3,738.39
3,725.48
5,315.87
11,053.90
Unreported Net Income
17,249.47
27,006.28
25,276.22
17,931.01
35,437.29
Schedule B - Unreported Net Income
1944
1945
1946
1947
1948
Increase in Net Worth
$40,587.69
$49,528.02
$55,281.08
$42,436.06
$16,785.88
(See Schedule A, supra)
Nondeductible Expenditures
13,469.35
13,600.36
19,264.61
17,543.79
17,561.73
Total Income
54,051.04
63,128.38
74,545.69
59,979.85
34,347.61
Nontaxable Income and Additional
Deductions
12,36
1,898.09
5,790.59
7,257.87
5,088.16
Total Net Income
54,038.68
61,230.29
68,755.10
52,721.98
29,259.45
Reported Net Income
12,101.45
18,098.04
16,261.54
14,965.07
24,529.07
Unreported Net Income
41,937.23
43,132.25
52,493.56
37,756.91
4,730.38
*137 Petitioners filed their Federal income tax return for 1948 on September 15, 1949. Prior to March 15, 1949, the collector of internal revenue by letter granted petitioners a thirty-day extension within which to file their return until April 15, 1949. Petitioners then requested another thirty-day extension which was not granted. Petitioners attached an affidavit to their return for 1948 which contained statements in explanation of its late filing. Prior to March 15, 1949, petitioners had retained an attorney (other than their counsel herein) and a certified public accountant (other than Smith) to represent them with respect to matters involving income taxes for years including 1948. The late filing of the return for 1948 was due to reasonable cause and not to wilful neglect. There is a deficiency in income tax for each of the taxable years 1939 through 1948. Part of each such deficiency is due to fraud with intent to evade tax. Opinion FISHER, Judge: Petitioner Oscar Olson was the proprietor of a retail jewelry store in Fort Dodge, Iowa, during the years in question, 1939 through 1948. He had numerous investments in various income-producing properties and he also engaged in speculative *138 activities with respect to loose diamonds, securities, and commodities. For each of the taxable years he filed a separate income tax return, with the exceptions of 1939, 1944 and 1948 for which years he and his wife, petitioner Myrtle Olson, filed joint returns. Petitioner maintained books and records pertaining to his store operations, and some of such records for the years 1939 and 1946 through 1948 were offered in evidence. These records, however, were neither complete nor accurate and they did not clearly reflect the income and expenses of the store for any of those years. With respect to his investment and speculative activities, petitioner maintained no system of accounting and his only records thereof were fragmentary and incomplete. Under the above circumstances, petitioners have no records which clearly reflect income during the years in question within the meaning of section 41, Internal Revenue Code of 1939, and respondent was justified in using the net worth plus expenditures method in determining net income for each of those years. See Estate of W. D. Bartlett, 22 T.C. 1228; and Frank Imburgia, 22 T.C. 1002. Each notice of deficiency issued *139 to petitioners in the instant case included as an exhibit thereto a statement entitled "Increase or Decrease in Net Worth." (The statement itself was not attached to the copy of the deficiency notice filed with the petition.) The statements contained over 100 items (including nondeductible expenditures) relating to the years 1938 through 1948. The parties stipulated the accuracy of most of these items and also stipulated certain other items of net worth which were not contained in respondent's statement. These items were considered and incorporated in our findings of net worth and net income, Schedules A and B, supra. Petitioners, however, (1) dispute the remaining items on respondent's statement, and (2) further contend that there are additional assets and liabilities which were not contained in the net worth statement. 1. Disposition of the disputed items (including some nondeductible expenditures), has been made in part as follows: (a) Some were conceded by respondent to be as contended by petitioners. (These items are referred to by the parties as Items 35, 40, 60, 62, and S5.). (b) Some were conceded by petitioner to be as determined by respondent. (These items are referred *140 to by the parties as Items 42, 43, 44 and 29(a).) (c) Some are held in our findings to be other than as determined by respondent. (These items are referred to by the parties as Items 41, and "v" - personal living expenses.) (d) In some instances, petitioners' evidence was insufficient to overcome the presumptive correctness of respondent's determination. (These items are referred to by the parties as Items 25, 48, 56, 58, 59, and 67.) See Bryan v. Commissioner (C.A. 5, 1954), 209 Fed. (2d) 822, 825. In this regard, with respect to Item 25 ("Lamson Bros. - Grain Act. - Oscar"), petitioners offered in evidence a piece of paper purporting to have pencilled thereon various balances on the dates indicated thereon in one of petitioner's commodity broker accounts. It was conditionally received subject to further consideration and argument in the briefs. We question whether the piece of paper is admissible in evidence for the purpose of establishing that the figures written thereon represented credits to the account of Olson or the dates of such credits. Assuming its admissibility, however, it has no probative value here. It does not reflect materially on the issue of fraud, *141 and it is not helpful from the standpoint of the net worth computation because it establishes no year-end figures. We not only fail to find in the record any evidence of such year-end figures in the Lamson account, but also fail to find evidence that the items on the piece of paper, if credits to such account, remained unchanged for periods including year-ends. We have, accordingly, given no effect to the figures in question. Our determinations with respect to the above disputed items are incorporated, supra, in our findings of net worth and net income. 2. With respect to assets and liabilities which petitioners contend should be considered in addition to those contained in respondent's net worth statement, our findings are dispositive of all factual issues relating thereto. These items are also incorporated in our findings of petitioner's net worth as of the end of each year in question. Two of these items, the accounts payable of the store at the end of each of the years 1938 through 1943 and the loans made by petitioner secured by loose diamonds, are supported by credible evidence for each pertinent year. The remaining items, loose diamonds held by petitioner for speculative *142 and investment purposes and cash and bearer bonds, however, require some further discussion. Respondent's net worth statement determined that petitioner had cash on hand and in safe deposit boxes at the end of 1947 and 1948 only, in the respective amounts of $11,637.20 and $10,657. No other cash and no loose diamonds or bearer bonds are contained in respondent's statement. Moreover, respondent determined that petitioner's net worth at the end of 1938 was $52,290.28. We are convinced that this beginning net worth is greatly understated in view of petitioner's extensive activities prior thereto, the diamond loans then outstanding, and the evidence of his loose diamond holdings at about that time. We think it is clear from the record that, as of the end of 1938, Olson's assets included a substantial amount of loose diamonds, together with some cash and bearer bonds, which were used in connection with his diamond speculations. We think it unnecessary (and, as a practical matter, impossible) to segregate from each other the items of loose diamonds, cash and bearer bonds. The three items are interrelated, and we treat them as one, partly because to do so will not affect the result, and *143 partly because of the absence of any reliable means of doing otherwise. We think it apparent that at least through 1941 the year-end amount of each of these asset items (as distinguished from the total of the three) varied in accordance with whether petitioner was buying or selling. For the same period, it seems clear that loose diamonds represented the larger part of the combined item, but that thereafter cash represented the larger amount in view of Olson's liquidation of his loose diamond holdings at a profit during the earlier years. When we come to the determination of the amount to be included as the opening net worth figure at the end of 1938 to represent loose diamonds, cash and bearer bonds, we face a record which furnishes no basis for the determination of any figure which has any semblance of accuracy. The record contains widely varying "estimates" and "recollections." Some of these are offered to reflect the value of the loose diamonds, although our inquiry must be directed to cost or adjusted basis. It is obvious that Olson is an unreliable witness and we can place little if any faith in his statements of the data he produced except where there may be some corroborating *144 background or surrounding circumstances. Despite the almost hopeless condition of the record, however, we think there is a basis for the application of judgment in accordance with the principles established in Cohan v. Commissioner, 39 Fed. (2d) 540, 544. We have weighed all of the evidence reflecting upon the problem, including the factor of basis, (with skepticism particularly because of the character of the evidence and our lack of faith in Olson as a witness) and have concluded that a reasonable figure for this combined item in opening net worth is $125,000. What we have said with respect to the difficulties of determining an opening net worth figure relating to diamonds, cash and bearer bonds applies (though to a less marked extent, once the opening figure is determined) to the determination of the same item as of the end of succeeding years. Here, however, the effect is less significant because the result of any haziness is merely to shift income from one year to another. We have given the problem the same careful attention as in determining the item for the opening net worth, and have reached the conclusions set forth in our findings of fact. Before leaving *145 the foregoing to consider the issue of fraud, we point out (as will appear infra) that our determination of the existence of fraud in each year (with respect to which respondent has the burden of proof) is based upon evidence which is unaffected in substance by the accuracy of our determinations of opening and closing net worth for each year. In our findings (Schedule B), we have set out the amount of net income which petitioner (or petitioners) failed to report in the return filed for each of the years in question. Respondent determined that part of the deficiency in each year was due to fraud with intent to evade income taxes. It is our view that the record in the instant case establishes such fraud by clear and convincing evidence, for it is replete with instances of deliberate actions of petitioner to conceal and understate his income for the purpose of evading taxes, as well as other facts which constitute persuasive evidence of fraud. Only a few items need be mentioned here to point out the consistent pattern of fraud which existed during all of the years involved herein. In each of *146 the returns for 1939 through 1942, unsubstantiated interest expense which bore no rational relationship to petitioner's then total indebtedness was claimed as a deduction, and in those for 1939 and 1945 through 1948 obviously personal expenditures (such as those for life insurance, house carpeting, and reburying petitioner's mother) were also claimed as business expenses despite official determinations to the contrary in this respect in 1940 and thereafter. In all of the returns income was understated due to the omission of income from one or more of the following sources: dividends, capital gains, interest and rents. Moreover, petitioner admitted that he failed to report substantial income from diamond sales in the years 1939 at least through 1941. He also admittedly failed to report income from his speculative activities in commodities and securities at least during the years 1942 to 1948, inclusive. With respect to the operations of the jewelry store, petitioners concede that the income was not accurately reported during the years in question, that petitioner altered the accounts receivable records for the years 1938 and 1939 by increasing the total amounts thereof, and that during *147 1946 through 1948 he charged the cost of some security investments to the store's merchandise accounts without adding them in to the closing inventory each year. During the course of the investigation by respondent of petitioner's financial affairs, he attempted to mislead the agents in an effort to conceal his assets and records thereof. Finally, as set forth in our findings of fact, petitioner was found guilty on July 2, 1953, upon his plea of nolo contendere to both counts of the Information filed against him, of attempting to evade his income taxes for the years 1946 and 1947, and was sentenced to a fine of $10,000 and two years imprisonment. It is our view that the above indications of fraudulent intent coupled with the repeated gross understatements of net income during all the years in question are clear and convincing evidence that each deficiency was due in part to fraud with intent to evade income taxes. We may add that the fraud for all years is quite apparent without resort to any inference from his plea and conviction. In view of our finding of fraud, limitations do not bar this proceeding with respect to any of the taxable years. Section 276(a), Internal Revenue Code *148 of 1939. In addition to fraud penalties, respondent has asserted a delinquency penalty against petitioners pursuant to section 291(a) of the 1939 Code for the late filing of their 1948 return on September 15, 1949. Since the return was not filed within the time prescribed, the burden is upon petitioners to show that their failure was due to reasonable cause and not wilful neglect. Cf. Joseph v. Moriarty, 18 T.C. 327. affirmed 208 Fed. (2d) 43. The evidence of record establishes that prior to March 15, 1949, petitioners had requested and been granted a thirty-day extension (until April 15, 1949) within which to file a return. A further extension was subsequently requested but was denied. The 1948 return was filed on September 15, 1949, and purports to bear, in addition to the signature of Oscar Olson, the signature of D. W. Billings, a certified public accountant, of Billings & Co. Attached to the return was an affidavit subscribed and sworn to by both petitioners on September 14, 1949, which, the parties stipulated, contained "allegations for not filing said *149 return until September 15, 1949." The parties also stipulated that the return may be received in evidence in the instant case as one of respondent's exhibits, and the affidavits was attached to it when presented by respondent as Exhibit J. The affidavit contains in effect the following statements: that after the investigation of their returns for the years 1940 through 1947 was commenced, at the recommendation of their "tax attorneys" they engaged D. W. Billings, a certified public accountant to audit their affairs; that prior to the end of the first extension their attorney, Loyal E. Keir, wrote the collector to request a further extension until May 15, 1949, in order to complete the audit; that under date of April 14, 1949, the collector wrote petitioners in care of their attorney in part as follows: "In reply you are advised that the reason advanced in the request for additional extension of time is not sufficient to warrant the granting of a further extension. It is suggested that you prepare your 1948 return and forward same to this office at an early date. If the return is filed after April 15, you are requested to attach thereto an affidavit explaining reason for failing *150 to file the return on or before the extended due date, April 15." and that, as the result of his conversation that same day with an internal revenue official, it was Keir's "impression" that the filing of an affidavit with the late return would accomplish the same purpose as the granting of an extension of time. The balance of the affidavit states as follows: "One of the reasons for the delay by Mr. Billings in completing his audit was that it was necessary for him to take a complete inventory of our stock in May. This was a tedious job and after the inventory was completed a substantial amount of time was needed to complete the audit. Not long thereafter we learned that Mr. Billings was severing his connections with the general practice of accountancy in Des Moines and was accepting a position with the Fairway Stores in Boone, Iowa. As the result of this change Mr. Billings had to devote a considerable amount of his time in closing up some of his other pending audits and we thus encountered an additional substantial delay in the completion of the audit of our affairs. "The attached return was prepared immediately upon Mr. Billings' completion of his audit and we have exerted *151 every effort to file the return at as early a date as possible. "In view of the foregoing we respectfully request that no delinquency penalty be imposed." We think that in view of the terms of the stipulation and the manner in which it was offered in evidence, the affidavit is before us as evidence for such consideration as may be appropriate. In view of all of the circumstances, as outlined below, we think that petitioners have met the burden of proving that the late filing was due to reasonable cause and not to wilful neglect. We note that although ten taxable years are before us, the year 1948 is the only one involving late filing, so that there is no pattern of delinquency. Two formal requests for extension were filed indicating an intent to comply with the requirements of the collector. The first was granted, and the letter of the collector relating to the second at least intimated that, if the return was filed after April 15, consideration would be given to an accompanying affidavit, if presented, explaining failure to file on or before the extended date. Petitioners were represented by both an attorney and an accountant, and under the circumstances had the right to rely *152 upon their advice, (Portable Industries, Inc., 24 T.C. - (filed June 30, 1955), particularly since the latter were familiar with the facts. The delay appears to have been attributable at least in part to circumstances affecting the accountant over which the petitioners had no practical control. The return shows that it was prepared by the accountant, and we think that it is reasonable to infer that this included the preparation of the affidavit by him rather than by petitioners. Our observation of Olson leads us to believe that he himself would have had no knowledge of the requirements for an extension, or their sufficiency, and the problem was one which a taxpayer would naturally have left to advisers with professional experience and training. The statements in the affidavit were based upon circumstances of a nature which would naturally be known to the accountant, and we know of no reason to question the truth of the contents thereof. We hold, therefore, that petitioners are not liable for the delinquency penalty asserted for 1948. During the course of the hearing herein, respondent endeavored to establish, by the so-called percentage mark-up method, the amount by which the *153 gross profit of the jewelry store was understated on each return. He contends that the normal average mark-up of cost of goods sold in the industry during the taxable years was not less than 100 per cent, whereas the average mark-up reflected in the return for each of those years was between 40 per cent and 82 per cent, and that this difference in percentage mark-up, when applied to the reported cost of goods sold each year, establishes the amount by which gross profit was understated in each return. It goes without saying that if the mark-up as reflected in the returns was understated, the practical result would be an understatement of gross and net income. The factor of mark-up is necessarily, therefore, a significant element to be considered. In the instant case, however, respondent places his substantial reliance upon determination of net income by the net worth and expenditures method, and we have followed the same method in reaching our own conclusions. It is obvious from the record that Olson's income stemmed from many sources, and it is our view that under the circumstances of this case, the net worth and expenditures method presents the best technique for achieving reasonably *154 accurate over-all results. If this method has been correctly applied, it should, in the over-all result, reflect the profits which were understated in the returns. Respondent argues that we should hold that Olson's actual mark-up approximated that of the industry in general. There is no reason, however, to assume that the results of whatever his actual mark-up may have been (and we have no way of determining with reasonable certainty what the mark-up really was) have not been substantially reflected in the net worth approach as we have applied it in our determination of substantial understatements. Decision will be entered under Rule 50. Footnotes
*. Including living expenses, income taxes, and insurance premiums. ↩
**. Including exempt interest, 50 per cent of long-term capital gains, and incomes of family members other than the taxpayer or taxpayers involved for each year. (Petitioners filed joint returns for 1939, 1944 and 1948.) ↩
***. Including adjustments resulting from audits of the 1939 and 1945 returns.↩