ESTATE OF W. D. BARTLETT, DECEASED, JAMES A. DUNN, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 38882. Filed September 21, 1954.

*W. G. Ward, Esq.*, for the petitioner.
*Ralph V. Bradbury, Esq.*, for the respondent.

FINDINGS OF FACT AND OPINION.

RAUM, *Judge:* The Commissioner determined deficiencies in the aggregate amount of $127,619.43 for 1944, 1945, and the period January 1–June 8, 1946, with respect to income tax liability of W. D. Bartlett, who died on June 8, 1946. The returns in question were filed with the collector of internal revenue at Jacksonville, Florida. The returns reported net income in the amount of $20,292.79 for 1944, a net loss of $2,351.45 for 1945, and a net loss of $34,474.61 for the period January 1–June 8, 1946. The deficiencies were determined by using the increase in net worth and expenditures method. Petitioner challenges the use of the net worth method, contending that Bartlett's books furnished an adequate basis for determining income and that therefore resort to the net worth method is not justified. Moreover, assuming that the net worth method is to be employed, the parties are in disagreement as to two items in the opening net worth statement (as of January 1, 1944), namely, the amount of cash on hand and an item of $15,000 with respect to a so-called "refrigeration deal" in Cuba, and they are also in disagreement as to one item in the closing net worth statement (as of June 8, 1946), namely, the amount of the decedent's

interest in Club 86. Finally, the parties are in disagreement as to whether a certain bad debt deduction is allowable for the period January 1–June 8, 1946.

All facts stipulated by the parties are incorporated herein by reference as part of our findings. The record is highly confusing, and it has been difficult to piece together a coherent picture of the materials placed before us. However, the following is sufficient for the disposition of the issues presented to us for adjudication.

The taxpayer, W. D. Bartlett, was a man of many interests. During the taxable years he participated in a number of ventures. Some of these ventures were conducted by partnerships in which Bartlett was a partner. The composition of these partnerships and the extent of Bartlett's interests therein were not shown in the evidence presented to us. Among the activities engaged in by these partnerships were bookmaking, bolita, gambling, and slot machine operations. These partnerships and ventures included the following: Acme Amusement, Padgett & Dyer, Teepee Casino, A. B. C. News Agency, Frolics Club, and Club 86.

Bartlett was also interested in the manufacture and operation of certain kinds of electrical and mechanical devices or equipment, including so-called "claw" or "digger" machines of the type used at carnivals. In addition he owned 50 per cent of the stock of a Cuban company, known as Cia. Lamparas Electro de Cuba, S. A. (referred to hereinafter as Cia. Lamparas), that was engaged in manufacturing fluorescent lights. Bartlett would buy raw materials on his own account in the United States and ship them to Cia. Lamparas at cost plus expenses. He also had various other interests and investments, including Cia. Omega in Cuba, 30th Street Corporation, Inc., and Kimberley Diamond Cutters, Inc.; neither his interests in these businesses nor his income therefrom were reflected on his books, hereinafter mentioned.

Bartlett had an office and employed a bookkeeper. He also utilized the services of an accountant on a part-time basis. He maintained a set of books. These books, except the ledger, which had mysteriously disappeared, were in the courtroom during the trial, but were not introduced in evidence.

Bartlett had cash on deposit in banks located in Winnipeg, Canada; Havana, Cuba; South Dakota; Minnesota; and Indiana; such deposits were not shown on his books. His loans and investment account with Cia. Lamparas were not shown on his books for 1945 and 1946; and his transactions involving the shipment of merchandise to Cia. Lamparas, receipts therefrom, and the setting up of accounts receivable, were not fully and adequately recorded. From the evidence with respect to Bartlett's books we find that they did not contain information from which a capital account of Bartlett could be deter-

mined, that they did not reflect all of his financial transactions, and that Bartlett's true income for the years involved could not be determined from those books.

Petitioner contends that in addition to those books one must also take into account the books of the various partnerships in which Bartlett was interested. However, the evidence as to the books of the partnerships was scanty and unsatisfactory. No such books were offered in evidence nor was there convincing evidence that each such partnership kept an adequate set of books from which petitioner's distributive share of income could be accurately determined. Moreover, it is not at all clear from the evidence that Bartlett was not interested in some ventures, other than the partnerships disclosed in the record. For example, during the course of the Government's investigation there was discovered an item of income in the amount of $5,629.36, growing out of a so-called Hawaiian "venture" which had theretofore been undisclosed. This item does not appear to have been reflected on Bartlett's books, and, in view of the nature and widespread character of Bartlett's interests and activities, we have no reasonable way of knowing, on this record, whether there may not have been other unrecorded items of income.

In view of the evidence herein we cannot find that Bartlett's books accurately reflected his income, whether taken by themselves or in conjunction with such books as were kept by the partnerships. Moreover, the net worth method is not a system of accounting such as is referred to in section 41 of of the Internal Revenue Code of 1939; it is merely evidence of income. See *Morris Lipsitz*, 21 T. C. 917. Even where the taxpayer presents a set of books that appears superficially adequate, the application of the net worth method may show such a substantial variance with the reported income as to suggest the untrustworthiness of the books. As we said in the *Lipsitz* case (p. 931) :

when the increase in net worth is greater than that reported on a taxpayer's returns or is inconsistent with such books or records as are maintained by him, the net worth method is cogent evidence that there is unreported income or that the books and records are inadequate, inaccurate, or false. It is not correct to say that the use of the net worth method is forbidden where the taxpayer presents books from which income can be computed, for the net worth method itself may provide strong evidence that the books are unreliable. * * *

Accordingly, we reject petitioner's contention that the Commissioner was not justified in resorting to the net worth method,[1] and we pass to consider various issues presented by the parties in connection with the application of that method to the facts of this case.

---

[1] Petitioner concedes in any event, even if the Commissioner were not justified in resorting to the net worth method, that various adjustments must be made to the returns as filed in order to reflect certain items of income that were unreported.

Our problem with respect to the increase in net worth is considerably simplified by reason of stipulations of the parties as to most of the items appearing in both the opening (January 1, 1944) and closing (June 8, 1946) balance sheets. The parties are in agreement that the aggregate of the items on the opening statement is $327,303.90, except that petitioner contends that two more items must be added, namely, cash in the amount of $111,726.68, and a so-called "refrigeration deal" item of $15,000.

The Commissioner's position provides for cash on hand in the amount of only $200 in the opening balance sheet. We think this is unrealistic on the evidence before us. Cf. *Michael Potson*, 22 T. C. 912. The nature of Bartlett's activities was such and the record satisfies us that he at all times relevant had substantial amounts of cash on hand. There is no dispute between the parties that he had cash on hand and in safe-deposit boxes in the amount of $37,605 on May 31, 1940, and in the amount of $77,455 on the date of his death, June 8, 1946. However, we do not accept petitioner's contention that Bartlett's cash on January 1, 1944, was $111,726.68. The computations whereby that figure was arrived at do not prove to our satisfaction that he in fact had that much cash on hand on January 1, 1944. We do not have available any accurate basis in the record for determining Bartlett's cash position on January 1, 1944, but, doing what we can with the materials at hand, it is our best judgment, and we so find as a fact, that Bartlett had cash on hand in the amount of $45,000 on January 1, 1944. Cf. *Cohan* v. *Commissioner*, 39 F. 2d 540, 544 (C. A. 2). As to the "refrigeration deal" item of $15,000 we do not have any competent or convincing evidence that Bartlett owned the claim or had the rights associated with that transaction on the critical date, January 1, 1944. Accordingly, since the burden of proof is upon petitioner, we find as a fact that this item was not one of Bartlett's assets as of January 1, 1944.

As to the closing balance sheet for June 8, 1946, the parties are in agreement that the total is $473,845.69, except for one item of $24,792.36 included therein with respect to Bartlett's interest in Club 86, a gambling casino. Petitioner asks that this item be reduced by $2,934.60 to $21,857.76, but has failed to present any convincing evidence warranting such reduction. Accordingly, we accept the stipulated figure of the parties without reduction on account of the Club 86 item.

In applying the net worth method respondent treated the increase in net worth (without including in such increase any unrealized increase in value of any asset) plus nondeductible expenditures made during the period (such as living expenses, etc., none of which was contested at the trial) as taxable income of Bartlett for the period

January 1, 1944–June 8, 1946. He then spread that income proportionately according to the number of days in each of the three taxable periods, and thus determined Bartlett's net income for the calendar years 1944, 1945, and the period January 1–June 8, 1946. In the absence of the availability of any more precise method of dividing the total income among the three taxable periods we cannot say that the Commissioner's method was erroneous. We hold that petitioner has shown no error in the manner in which the Commissioner applied the net worth method. This case is wholly unlike *Vincenzo D'Alise*, 21 T. C. 511, in this connection, where the Commissioner had made a determination of fraud in circumstances casting grave doubts upon the correctness of his action, and where the proof of fraud, the burden being on the Commissioner, was found to be woefully inadequate. Nothing said in the *D'Alise* case was intended to disapprove in a proper case the method of determining income such as was employed here.

The final issue in the case relates to a deduction for a bad debt for the taxable period January 1–June 8, 1946. Bartlett owned 50 per cent of the stock of a Cuban corporation, referred to as Cia. Lamparas, which owed him $73,855.14 for unpaid merchandise which he had shipped to it as well as for money advanced. After Bartlett's death, his entire interest in Cia. Lamparas, stock plus creditor interest, was sold for $35,000. In the income tax return for the period ending June 8, 1946, a bad debt deduction in the amount of $73,855.14 was claimed. At the trial, however, petitioner's counsel conceded that the claimed deduction should be reduced by $35,000 and also by a further item of $1,238.06, representing an offsetting liability from Bartlett to Cia. Lamparas, thus leaving a net deduction for bad debt in the amount of $37,617.08.[2] The Commissioner opposes the deduction on the ground that prior to Bartlett's death a contract had been entered into between Bartlett and several others whereby his creditor interest in Cia. Lamparas was to be merged with his stock interest, with the result that on his death there was no debt at all running to him from Cia. Lamparas. We are satisfied that there was such a contract, but we are also satisfied that such contract was never carried out and that it was merely in an executory state as of the time of Bartlett's death. We hold that a bad debt deduction in the amount of $37,617.08 is allowable for the period ending June 8, 1946.

*Decision will be entered under Rule 50.*

---

[2] Petitioner's counsel at the trial conceded that the amount of bad debt originally claimed should be reduced not only by $35,000 but also by the further amount of Bartlett's debt to Cia. Lamparas. In petitioner's brief, the latter concession (in the amount of $1,238.06) seems to be ignored, and a net deduction in the amount of $38,855.14 is claimed. In view of the unequivocal concession at the trial, we regard the net amount of the bad debt in controversy to be $37,617.08.