Murl P. Clark v. Commissioner.
Clark v. Commissioner
Docket No. 52985.
United States Tax Court
T.C. Memo 1956-176; 1956 Tax Ct. Memo LEXIS 115; 15 T.C.M. (CCH) 913; T.C.M. (RIA) 56176; July 30, 1956
*115 David Berger, Esq., and William J. Duiker, Esq., Southern Building, Washington, D.C., for the petitioner. Stephen P. Cadden, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: This proceeding involves deficiencies in income tax and additions thereto for the years 1947, 1948, 1949, and 1950, as follows: Additions to tax under
Sec.
Sec.
Year
Deficiency
293(b)
294(d)
1947
$ 2,140.00
$1,070.00
1948
7,019.22
3,509.61
1949
679.53
339.76
1950
13,708.32
6,854.16
$2,246.92
The issues are: (1) whether petitioner understated his taxable income for each of the taxable years; (2) whether the additions to tax were properly imposed for fraud, for failing to file a timely declaration of estimated tax, and for a substantial underestimation of estimated tax; and (3) whether assessment of the deficiency for 1947 is barred by the statute of limitations. Findings of Fact Petitioner, a resident of R.F.D. No. 1, Strasburg, Pennsylvania, filed his income tax returns for the taxable years on the cash basis with the then collector of internal revenue for the first district of Pennsylvania. During those years he was married and had 3 children who were 25, 21, and 19 years of age, respectively, *116 in 1955. Petitioner's principal sources of income during the taxable years were from a potato processing business, in which he purchased potatoes from farmers and then graded and packed them for sale to stores and through produce dealers in Philadelphia, and general farming on 4 farms, 2 of which were farmed by tenants on an equal basis. The income tax returns of petitioner for the years 1947 and 1948 were filed on March 10, 1948, and March 7, 1949, respectively. The petitioner executed consents extending to June 30, 1954, the period for assessment of taxes for 1947 and 1948, with the provision that the consent applicable to 1947 was "not intended to extend the statutory 3-year period and will be operative only if it can be ultimately established that Sec. 275(c) of the Internal Revenue Code is applicable". The deficiency notice for the taxable years was mailed on February 24, 1954. The crops raised by petitioner on his farms included corn, wheat, potatoes, and tobacco. Some crops were grown for consumption in his home. Considerable acreage of one of the farms was devoted to pasturage for cattle, which petitioner generally purchased in the fall and sold in May or June of the next year. *117 Petitioner was required at times to use currency for the purchase of cattle. A chicken business was operated on one of the farms. Petitioner maintained a bank account in which he deposited proceeds of sales. Petitioner had no training in bookkeeping. Until August 1949 he made entries in a book for receipts and expenses. The entries were generally made each evening. A separate book was kept for each year. In August 1949, when petitioner opened a warehouse for processing and packing potatoes, he employed Molly Weaver, a high school graduate 17 years of age, with no training or experience in bookkeeping, to open up and keep a new book. Thereafter entries in the books for receipts and expenses were made by Molly Weaver. Checks were issued for potatoes purchased from farmers. The entries she made in the books for sales of potatoes were based upon information received from petitioner. She also made entries in the books for sales of produce from the farms. Molly Weaver was married in 1951 to a son of petitioner. The returns filed by petitioner for the years 1947, 1948, and 1949 were prepared by petitioner's attorney from tabulations made by petitioner of his income and expenses. The cost *118 of cattle was at all times entered in petitioner's books, and claimed in the returns, as an expense. The books maintained by petitioner were utilized by the attorney in connection with deductions claimed for depreciation, and for verification of any figure the attorney had reason to question. The attorney did not sign the returns as having been prepared by him because he made no audit of the books. He regarded petitioner's books as becoming increasingly inadequate to use as a basis for the preparation of income tax returns and suggested to him that he employ the services of an accountant. The return for 1950 was prepared by Richard Kuntz, an accountant. He started a new system of bookkeeping for petitioner and in 1951 visited the office about once a month to examine the books and records. Depreciation was claimed in the returns upon the following costs or other bases: 1947
1948
1949
1950
Farm buildings
$50,000.00
$50,000.00
$50,000.00
Farm equipment
3,000.00
3,715.00
3,715.00
Trucks
3,015.00 [1]
4,500.00 [2]
19,250.00
Trailers
2,800.00
$ 8,778.00
Warehouse and heating plant
24,100.00
Trucks and tractors
43,219.00
Building
31,249.49
Equipment
4,774.39
Office equipment
81.75
Total
$56,015.00
$58,214.00
$99,865.00
$88,102.63
*119 Until he had an office in his warehouse in 1949, petitioner stored his books and other business records in a cabinet at his farm home. Petitioner moved into a new house about July 1, 1951. A few days prior thereto his wife requested and received the permission of petitioner to destroy the records to avoid the task of moving them to their new home. Pursuant to such permission, she burned the records in the process of moving. The book kept for the last 5 months of 1949 was at the warehouse and was not destroyed. Revenue agent Raymond C. Hipple visited the office of petitioner on December 12, 1951, for the first time to conduct an examination of the latter's return for 1949. In March or April 1952, Hipple informed petitioner that he was unable to verify returns from records available to him, whereupon petitioner suggested that he contact Kuntz. A conclusion was then reached to include the years 1947 and 1948 in the investigation. Later, the period was extended to include the year 1950. Thereafter, Kuntz worked up figures which Hipple and a special agent, who had been called into the case, checked for accuracy and found them to be quite accurate. The agents *120 asked Kuntz to produce petitioner's books and were told that none was available for the years then under investigation. Petitioner discontinued the services of Kuntz in 1952. Practically all of the checks received by petitioner in his business were deposited in his checking account. At times he would subtract from the total of the checks listed on the deposit slip an amount for cash, which he used to pay for labor and other expenses and to cash checks for farmers and truck drivers. The net amount was then entered to his credit in the bank account. The books and records of petitioner for the period prior to August 8, 1949, including cancelled checks and check stubs, were not available for an examination of his income tax liability. The books and records maintained by petitioner for the remainder of 1949 and for 1950 were inadequate for income tax purposes. The adjusted gross income reported by petitioner and determined by respondent by the net worth method for the taxable years was as follows: Year
Reported
Determined
1947
$ 197.63
$11,860.69
1948
3,962.78
25,514.66
1949
4,833.04
8,668.07
1950
5,472.66
37,522.80
Total
$14,466.11
$83,566.22 The return filed by petitioner for 1947 reported the receipt *121 of $10,593.68 from the sale of tobacco. The tobacco crop raised by petitioner in 1946 was sold for $24,500 during the early part of 1947 to P. Lorrilard & Company. The net worth statement consisted of the following items at the close of 1946 and each of the taxable years: ASSETS
1946
1947
1948
1949
1950
Miscellaneous [1]
$50,937.80
$53,937.80
$53,937.80
$ 56,078.30
$ 62,059.30
Bank balance [2]
2,326.03
1,856.74
6,880.72
10,847.39
16,076.34
Livestock inventory
12,143.72
12,317.05
18,972.05
6,450.00
12,592.90
Trucks and autos
2,486.00 [1]
4,649.46 [1]
18,613.73
32,420.67 [1]
Farm equipment
2,000.00
2,000.00
2,000.00
2,000.00
2,000.00
Warehouse
23,653.92
30,687.80
Warehouse equipment
1,229.75
4,576.32
Total
$67,407.55
$72,597.59
$86,440.03
$118,873.09
$160,413.33
Reserve for depreciation
9,790.00
10,496.72
11,640.57
14,464.77
20,689.71
Net assets
$57,617.55
$62,100.87
$74,799.46
$104,408.32
$139,723.62
LIABILITIES
Miscellaneous [1]
None
None
None
$ 27,000.00
$ 37,000.00
Net worth
$57,617.55
$62,100.87
$74,799.46
$ 77,408.32
$102,723.62
Increase net worth
$ 4,483.32
$12,698.59
$ 2,608.86
$ 25,315.30
Drawings - personal: Miscellaneous purchases [1]
3,717.05
2,800.00
5,558.34
Cash drawings and checks
3,660.32
10,016.05
6,059.21
5,709.16
Auto
750.00
Payment on lot
190.00
Gross income
$11,860.69
$25,514.64
$ 8,668.07
$ 37,522.80
Standard deduction
500.00
1,000.00
866.81
1,000.00
Taxable income
$11,360.69
$24,514.64
$ 7,801.26
$ 36,522.80
*122 The checking account of petitioner had the following amounts of outstanding checks at the close of the years shown: Year
Amount
1946
$ 1,529.43
1947
2,535.88
1948
1,183.09
1949
9,394.62
1950
16,994.63 Some of the outstanding checks were issued for property. After dispensing with the services of Kuntz, petitioner engaged a firm of certified public accountants, hereinafter referred to as public accountants, to determine his income tax liability for the taxable years. During the course of the investigation the public accountants verified from microfilm of bank records the list of cash deposits and withdrawals prepared by Kuntz, interviewed employees and relatives of petitioner, and sellers in regard to assets purchased. The opening inventory of $16,200 for livestock was determined from an analysis of bank records. Except for that amount and $11,442.90 at the close of 1950, the firm determined the same amounts as the respondent for the asset. The statements prepared by the public accountants disclose that petitioner had adjusted gross income of $3,403.01, $15,360.98, and $18,825 in 1947, 1948, and 1950, and a loss of $2,637.36 *123 in 1949. No cash expenditures were taken into account in arriving at the amounts. The return filed by petitioner for 1947 was false or fraudulent with intent to evade tax. Some part of the deficiency for 1947 was due to fraud with intent to evade tax. Opinion There is no merit in the contention of petitioner that respondent was not justified in resorting to the net worth method to determine his income tax liability. He had no books or records for the period prior to August 1949, and means were lacking to test the accuracy of the books kept for the remainder of 1949 and the year 1950 for tax purposes. The public accountants likewise found them to be lacking and unreliable and resorted to other means for their determinations. Clearly, respondent had ample justification for using the net worth method to determine petitioner's income tax liability. See Estate of W. D. Bartlett, 22 T.C. 1228; H. A. Hurley, 22 T.C. 1256; Abraham Galant, 26 T.C. - (May 28, 1956). Petitioner concedes the accuracy of some of the items included in the net worth statement. The amounts not agreed upon will be discussed in the order in which they appear in our findings on respondent's statement. Bank balances *124 Petitioner agrees with the amount at the close of each year but argues that a downward adjustment should be made for outstanding checks. The cash basis was used by petitioner for reporting income and respondent did not change that method in the preparation of the net worth statement. A change to an accrual method for the assets would obviously distort income. Many of the outstanding checks were issued for assets. For instance, of the total of $2,535.88 outstanding at the close of 1947, $2,529.63 was for the purchase of potatoes, cattle, and feed, and in 1948 all of the checks, except one in the amount of $87.09 for truck expense, were issued for potatoes. To the extent that the outstanding checks were for the acquisition of assets, adjustment of the bank balances would not change the amount of assets on hand. The evidence does not show the purpose for which the checks outstanding at the close of 1946 were issued or that their amounts were not claimed as deductions in that year. Neither was proof made that any of the checks in question were delivered in the year of issuance. The checks were noting more than an order on the bank to pay the specified amounts and the rights petitioner *125 had to stop payment made the entire balance subject to his demand at the close of the year. Accordingly, we are not warranted in reducing the bank balances for the amount of outstanding checks at the close of each year. Cattle inventory The cost of cattle on hand at the close of 1947, 1948, and 1949 is not being contested on brief. Petitioner contends that the amount for the opening net worth and on December 31, 1950, should be $16,200 and $11,442.90, respectively, as determined by his public accountants, instead of $12,317.05 and $12,592.90, as listed in respondent's net worth statement. The figures determined by the public accountants were based upon checks issued during the year for cattle and not outstanding at the close of the year, and whether the cattle were on hand at that time. The respondent's figures were based upon checks issued after October 1 each year and an assumption that such cattle were on hand at the end of the year. The reasonableness of respondent's basis is supported by testimony of petitioner that he generally bought cattle in the fall and fed them for the market until the following May or June. It does not appear that the petitioner ever maintained a cattle *126 inventory. He testified at the hearing that he could not determine whether the figures used by the respondent were excessive or understated. The determination of the public accountants was not made until 1952. What means they had at that time, if any, to determine the particular cattle on hand at the close of 1946 and 1950, is not shown. The figure of $11,442.90 appears to be nothing more than the total cost shown in petitioner's book for cattle purchased on November 6 and 7, 1950. The evidence offered by petitioner does not warrant any adjustment of the respondent's determination of cost of cattle. Trucks and automobiles Respondent included no amount in the opening net worth statement for these assets. Petitioner contends that he should have allowed $3,015 for trucks. As to the other years, the only contest is on the amount for 1949, which petitioner asserts should be $19,101.59 instead of $18,613.73, the amount included by respondent. The failure of respondent to allow the amount of $3,015 for trucks in the opening statement is supported by evidence submitted by petitioner that the assets were acquired in prior years and were fully depreciated by the end of 1946. The difference *127 of $487.86 at the close of 1949 is in favor of respondent and he is not claiming the benefit. In any event, the evidence offered by petitioner on the point is not sufficient to overcome the presumptive correctness of the respondent's determination. Accordingly, no adjustment will be made for these assets. Farm equipment These assets were included in the statement each year in the amount of $2,000. Petitioner alleges that the amount should be $9,000. The only benefit petitioner could derive from any additional allowance would be through an increase in the amount deductible for depreciation. However, the evidence does not warrant any upward adjustment. The figure of $2,000 used by respondent was also determined by the public accountants. The only evidence giving any support to the higher figure is unsupported testimony of petitioner estimating that the various items cost between $7,000 and $9,000. The probative value of that testimony is weakened by the absence of any evidence on the time of acquisition of the assets, and their useful life for exhaustion purposes. The condition of the evidence on these assets does not justify any alternation of the respondent's determination. Warehouse *128 Petitioner is contending that the amount determined by respondent for this asset should be $500 less in 1949 and $1,913.21 less in 1950. The difference in 1949 is due entirely to the capitalization at that figure of labor costs which petitioner had charged as an expense. Of the difference in 1950, $750 is due to an adjustment for the same reason. Except for the adjustments made for labor costs charged by petitioner to expense, respondent's costs were determined from checks. The amounts claimed by petitioner were determined by the public accountants by means not disclosed by the evidence. Absent evidence establishing error, the respondent's figures will not be disturbed. Warehouse equipment The petitioner contends that respondent's figure for this property at the close of 1949 is excessive in the amount of $359.75. Except for that amount they do not disagree on the correct figure on December 31, 1950. The costs determined by respondent were based upon cancelled checks. Petitioner relies entirely upon the determination of the public accountants, the basis for which was not shown. The meager evidence offered by petitioner fails to overcome the presumptive correctness of the respondent's *129 determination. Reserve for depreciation Respondent allowed depreciation of $9,790 in the opening net worth statement and an additional amount each taxable year. By the close of 1950 the reserve so allowed was $20,689.71. Petitioner is asking that we accept the figures determined by the public accountants, which are in excess of the amounts allowed by respondent. The periods of useful life shown in Bulletin "F" were followed by respondent as closely as possible in his allowances for depreciation. The evidence does not show the method employed by the public accountants. The evidence before us fails to establish that the respondent's determinations do not constitute reasonable allowances. Tobacco crop Petitioner's 1946 crop of tobacco was on hand at the close of that year and was sold during the early part of 1947 for $24,500. The respondent did not include the asset in his opening net worth statement on the ground that the cash basis was used throughout in its preparation. The public accountants employed the same method and did not treat the property as an assets of petitioner on December 31, 1946, in arriving at his net worth at that time. On brief he argues that the asset should *130 be included in the opening net worth in the amount of $24,500. Petitioner elected to report income on the cash basis. To include the asset in opening net worth at the sales price would, as in the case of the outstanding checks, distort income throughout the taxable years and give petitioner the benefit in 1946 of the cost of production without tax liability on gain in 1947. In any event, clusion of the asset could not be for more than cost and no proof was made of that amount. Under the circumstances no error was committed by respondent by not including the asset in opening net worth. Personal expenditures Of the amounts determined by respondent, petitioner concedes the correctness of the following amounts for the purposes shown: 1947
1948
1950
Augomobiles
$3,717.05
$2,800.00
Organ (for son)
$2,300.00
Truck payment
3,258.34 There remains in controversy the following items: 1947
1948
1949
1950
Cash drawings and checks
$3,660.32
$10,016.05
$6,059.21
$5,709.16
Automobile
750.00
Payment on lot
190.00 The basic difference between the parties on the first item of expense is the reasonableness of the amounts. The amount each year is the total of cash received out of checks deposited by petitioner and checks *131 respondent could not identify as chargeable for other purposes. Without conceding any amount as reasonable, petitioner contends that respondent failed to take into consideration amounts of cash used to pay farm labor, to purchase supplies, to pay for incidental purchases in connection with his business, and amounts used for cashing checks for farmers and business associates. We have only the testimony of petitioner on the use of cash for such purposes. As to farm help, he contends that he paid each of the 2 hands $50 a week the year around. At that rate, and without cash allegedly used for other purposes, nothing would be left for actual living expenses in 1947 for the family of 5, and only about $850 in 1949 and $500 in 1950. No attempt was made by petitioner to provide us with an estimate of his living costs. Neither was any evidence offered to support his testimony that cash was used for the other items. The lists of outstanding checks at the close of 1949 and 1950 contain numerous small amounts for labor and other expenses. Such amounts of cash as might have been used to cash checks would be reflected in the bank balances at the close of the year if deposited, and no proof was *132 made that they were not credited to his account within the year. Except for possibly the year 1948, the determinations of respondent for essential living expenses are modest amounts, considering petitioner's income and requirements. In any event, the evidence submitted to overcome such findings is insufficient to warrant any adjustment. The only contention being made by petitioner on brief on the remaining items is that respondent offered no evidence to support his inclusion of the amounts in the statements. The burden of proof was on petitioner. The respondent found that petitioner spent $750 on March 7, 1950, for the purchase of a Chevrolet automobile and in that year made a 10 per cent down payment of $190 on the purchase of a lot on which petitioner erected a home in 1951. Nothing was offered by petitioner to show that the determinations were incorrect. The finding on the lot has support in the finding of the public accountants that petitioner paid the entire purchase price of $1,900 for the lot in 1950. Without proof by petitioner of error, the amounts determined by respondent for personal expenditures will not be disturbed. Fraud Respondent had the burden under this issue to *133 establish by clear and convincing evidence that a part of the deficiency each year was due to fraud with intent to evade tax. We have found that such proof was made only as to the year 1947. Petitioner reported gross income of $197.63 for 1947, all of which, according to a statement appearing in the return, constituted net profit from farming operations. The public accountants engaged by petitioner to determine his tax liability for the taxable years concluded after an exhaustive examination that he earned net profits of $3,403.01 from farming operations in 1947 without taking cash transactions into account. Such an understatement of taxable income is an element for consideration in a fraud question. Petitioner kept his own book in 1947 and testified that his practice was to make entries in it for all items of expense and income, generally the day of each transaction. His return was prepared by an attorney solely from figures furnished him by petitioner. The crop of tobacco harvested by petitioner in 1946 was sold in 1947 to P. Lorrilard & Company for $24,500 and was verified by the public accountants during the course of their examination of bank records. Notwithstanding the sale *134 at that price, petitioner reported only $10,593.68 from the sale of tobacco in 1947. No evidence was offered on a sale or sales of tobacco for that amount or the year in which the product was harvested. Obviously it was not the selling price of the tobacco sold to P. Lorrilard & Company. Petitioner testified that he recalled "very well" the sale of his 1946 crop of tobacco P. Lorrilard & Company in 1947. His clear recollection of the transaction about 8 1/2 years after it occurred discloses the isolated nature of the sale. Petitioner made no explanation of any kind for failure to reflect the sale in his return. The distinct knowledge petitioner had of the sale at the time of the hearing in June 1955 is contrary to any idea that the amount was omitted from the book he kept and the return by oversight. Respondent made no proof of omissions of specific items of income in the other taxable years. He emphasizes, however, the destruction by petitioner of his books, allegedly after an investigation was started by his agents. There is some testimony indicating that the events occurred at the alleged time. Contrary evidence, which we regard as more reliable, is that the books and records prior *135 to August 1949 were destroyed about 6 months before the examination commenced. Consideration of all of the evidence fails to convince us that, except for 1947, any part of the deficiencies is due Decision will be entered under Rule 50. to fraud with intent to evade tax. Accordingly, on this issue we hold for respondent as to the year 1947 and for petitioner in the other taxable years. Additions, section 294(d) Respondent imposed an addition of $1,404.32 under section 294(d)(1)(A), Internal Revenue Code of 1939, for failure to file a declaration of estimated tax on time, and an addition of $842.60 under section 294(d)(2) for a substantial understatement of estimated tax. The addition for failure to file a timely declaration may be avoided by proof that the failure was due to reasonable cause and not to willful neglect. No such provision appears in section 294(d)(2). H. R. Smith, 20 T.C. 663. Petitioner seeks to avoid each of the additions solely upon the ground that he employed an accountant to prepare his return for 1950. An accountant did prepare petitioner's income tax return for that year but no evidence was offered that he was engaged to file a declaration of estimated tax. Without *136 any proof of error under the issue, respondent must be sustained. Statute of limitations The petitioner argues on brief that absent fraud, assessment of the deficiencies for 1947 and 1948 is barred by the statute of limitations. The issue as to 1947 is controlled by our finding that the return for that year was false and fraudulent with intent to evade tax. The pleadings do not raise a limitation question for 1948. If the issue were properly before us, decision would be for the respondent since the notice of deficiency was mailed within the statutory period of limitations as extended by a waiver. Footnotes
1. Acquired 1947. ↩
2. Acquired 1948.↩
1. Petitioner concedes are correct. ↩
2. Without adjustment for outstanding checks.↩