Don L. Corum v. Commissioner. Estate of Patria P. Corum and Don L. Corum v. Commissioner.
Corum v. Commissioner
Docket Nos. 55474, 55475.
United States Tax Court
T.C. Memo 1957-111; 1957 Tax Ct. Memo LEXIS 129; 16 T.C.M. (CCH) 459; T.C.M. (RIA) 57111; June 28, 1957
*129 Petitioner, a used car dealer, engaged in gambling activities throughout the taxable years involved, but did not report any income from such source during said years. Held: Respondent properly resorted to the net worth method to compute unreported income for the years 1946 to 1948, inclusive, and to the specific adjustment method for the years 1949 and 1950. Held further: Petitioner had unreported income for the years 1946, 1947, 1949 and 1950 in the amounts determined, but none for the year 1948. Held further: No part of the deficiencies for the years 1946 and 1947 was due to fraud but that at least a part of the deficiencies for each of the years 1949 and 1950 was due to fraud with intent to evade tax. Lewis R. Donelson, III, Esq., Commerce Title Building, Memphis, Tenn., and Edward G. Grogan, Esq., for the petitioners. James R. Harper, Jr., Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in the income tax of petitioners and additions to tax as follows: Don L. Corum
Addition to Tax
Year
Deficiency
Sec. 293(b)
1946
$ 1,003.55
$ 501.77
1947
3,905.56
1,952.78
1950
26,251.29
13,125.65
Estate of Patria P. Corum, Deceased,
and Don L. Corum, Surviving Husband
Addition to Tax
Year
Deficiency
Sec. 293(b)
1948
$ 248.50
$ 124.25
1949
2,981.84
1,490.92 The proceedings were consolidated at the hearing. The issues for decision are: (1) Whether respondent correctly determined by use of the net worth method deficiencies against petitioners *131 for each of the years 1946, 1947 and 1948; (2) Whether certain checks totaling $13,600 represent unreported taxable income from gambling for the year 1949; (3) Whether certain checks totaling $46,000 represent unreported taxable income from gambling for the year 1950; (4)Whether petitioners are liable for additions to tax for the years 1946 to 1950, inclusive, under section 293(b) of the Internal Revenue Code of 1939. Findings of Fact Some of the facts have been stipulated and are so found. Petitioner Don L. Corum is an individual who lived in Memphis, Tennessee, during the years 1945 to 1950, inclusive. Corum (hereinafter referred to as petitioner) filed individual income tax returns for the taxable years 1946, 1947, and 1950 with the collector of internal revenue for the district of Tennessee. Petitioner and his wife, Patria P. Corum, filed joint Federal income tax returns for the years 1948 and 1949 with the collector of internal revenue for the district of Tennessee. Patria P. Corum died on January 6, 1949, leaving no will and no property. She had no income for any of the years involved and her estate is joined herein only because she signed the joint returns for 1948 *132 and 1949. Petitioner is the sole owner of a retail used car sales lot known as Service Motor Sales located at 389 Union Avenue in Memphis, Tennessee. Petitioner established the business in 1944 and operated it successfully during all the years under consideration. During the years 1946 to 1950, inclusive, Service Motor Sales issued checks in the following total amounts which were charged to the Don L. Corum personal drawing account on the company's books: Total Amount of
Year
Checks Issued
1946
$7,714.28
1947
9,191.74
1948
9,826.77
1949
7,955.51
1950
8,432.40 The dates of issue of the checks, the check numbers, the payees, and the amount of each individual check have been stipulated and are incorporated herein by this reference. The checks comprising the total amounts charged to the Don L. Corum personal drawing account contain all of the checks charged to that account in the respective years indicated except all checks charged to the account in payment of personal life insurance premiums in all years, all checks charged to the account in payment of Federal income taxes in all years, check No. 2795, payable to R. J. Stanage & Co. dated October 23, 1947, in *133 the amount of $500, and check No. 1582 dated July 23, 1946 and issued by Service Motor Sales payable to Phillips Chevrolet Company in the amount of $1,850, of which $1,300 was charged to Don L. Corum's personal drawing account on the books of Service Motor Sales. During the taxable years 1946 to 1950, inclusive, the petitioner made payments of premiums on life insurance policies on his own life in the following amounts: Total Premiums
Year
Paid During Year
1946
$ 798.16
1947
1,064.40
1948
1,109.78
1949
1,109.38
1950
1,083.07
During the taxable years 1946 to 1950, inclusive, the petitioner made payments of Federal income tax in the following amounts: Year
Total Payments
1946
$3,940.78
1947
546.42
1948
5,510.78
1949
2,205.72
1950
525.60
Of the checks charged to the Don L. Corum personal drawing account during the years 1946 to 1948, inclusive, the following total amounts of checks were payable to Don L. Corum or to cash: Year
Amount of Checks
1946
$6,125.23
1947
5,416.64
1948
4,693.12 (includes
petty cash)
During the period 1946 to 1948, inclusive, petitioner used some of the funds derived from *134 checks payable to himself or to cash for reinvestment in his business and for the acquisition of assets. During these years cash deposits were credited to petitioner's personal account on the books of the Service Motor Sales Company in the amounts of $4,389.06, $725 and $717, respectively. In November 1947, petitioner purchased a house for a total purchase price of $12,750, on which a down payment in the amount of $500 had been made in October 1947 (see check No. 2795 to R. J. Stanage & Co., mentioned above), $6,000 was financed by means of a mortgage, and approximately $6,000 (after certain adjustments made at time of settlement) was paid in cash. In 1948 petitioner also purchased U.S. Government bonds and jewelry, for which he paid cash in the respective amounts of $800 and $406.24. Petitioner's books and records were maintained by a public accountant prior to and throughout the taxable years. The accountant had no record of petitioner's personal expenditures other than the cancelled checks drawn on petitioner's personal account with Service Motor Sales. When petitioner would draw money from the account, the withdrawal was reflected by check, but when money was deposited in the *135 account by petitioner the accountant credited petitioner's account without determining the source of the money deposited. At the end of the year the net amount in petitioner's personal account was closed out into the investment account of Service Motor Sales. Petitioner, his wife and two children lived in an apartment, for which he paid $22.50 per month, until he purchased the house in 1947. Petitioner's wife contracted cancer in October of 1947 and required constant attention until she died in January of 1949. Because of the seriousness of the disease, two of her sisters stayed with her most of the time. Medical expenses were paid by checks written on his personal account with Service Motor Sales. Petitioner's living expenses in 1948 were reduced as a result of his wife's confinement. During the year 1946 petitioner realized a profit on the sale of an automobile in the amount of $360. This amount was not shown on the books of Service Motor Sales and was not reported as income by petitioner. For the taxable period 1946 to 1948, inclusive, petitioner's income determined by the net worth increase plus expenditures method was as follows: 12-31-45
12-31-46
12-31-47
12-31-48
Assets
Residence
$12,750.00
$12,750.00
Jewelry
406.24
Equity in Service Motor Sales
$7,203.48
$3,591.32
13,095.73
10,900.08
Bonds
800.00
Automobile
775.00
1,522.95
1,522.95
1,522.95
$7,978.48
$5,114.27
$27,368.68
$26,379.27
Liabilities
Mortgage Payable
6,000.00
4,010.48
$7,978.48
$5,114.27
$21,368.68
$22,368.79
Increase (or decrease) in Net Worth
($2,864.21)
$16,254.41
$ 1,000.11
Add: Personal Expenditures
Premiums on Life Insurance
798.16
1,064.40
1,109.78
Payments on Federal Income Taxes
3,940.78
546.42
5,510.78
Living Expenses
3,685.22
2,466.74
7,903.53
Adjusted Gross Income
5,559.95
20,431.97
15,524.20
Less: Standard Deduction
500.00
500.00
1,000.00
Taxable Net Income Corrected
5,059.95
19,931.97
14,524.20
Less: Net Income Reported
5,799.76
19,154.97
15,099.96
Unreported Income
0
770.00
0
*136 On December 1, 1949, petitioner organized and commenced the operation of a dinner club in Memphis known as Hi Hat Dinner Club. Petitioner's initial investment in the dinner club was $1,954.37 in cash, none of which amount was taken out of petitioner's account with Service Motor Sales. During the years 1950 the dinner club operated as a partnership between petitioner and his son, Thomas Corum. This partnership was created by the gift of a $3,339.68 interest in the club from petitioner to his son. In 1950 petitioner invested $2,560.95 in the C & H Glass Co. The source of the funds invested in the glass company was not known to petitioner's accountant. During the period 1946 to 1948, inclusive, petitioner engaged in gambling in Miles, Illinois; Wycliffe, Kentucky; Cairo, Illinois; and Memphis, Tennessee. In 1947 petitioner began to gamble in small gin rummy games with T. W' Hoehn, a wealthy operator of a new and used car business immediately adjacent to that operated by petitioner. Petitioner and Hoehn were close acquaintances and had many business dealings together. Much of the success of petitioner's business was due to Hoehn's assistance. Because of his relationship to Hoehn, *137 petitioner was frequently called on to locate Hoehn when the latter was absent from his business while gambling and drinking. During the years 1949 and 1950 petitioner gambled more extensively with Hoehn and frequently for large stakes. On some occasions petitioner and Hoehn gambled alone but at other times other individuals participated. Some of the gambling took place in petitioner's office and some in Hoehn's hotel rooms. Petitioner and Hoehn played table stakes (no limit) in their poker games and bets ran as high as $300. Petitioner received his gambling winnings sometimes in cash and sometimes in checks. Hoehn was usually the loser in the games. T. W. Hoehn usually issued checks to pay off his gambling losses. Occasionally he would ask petitioner to cash a check for him during the course of games with gamblers who would not accept a check. He would sometimes write a check for the entire amount of the cash in a game in which he was participating. Winners in a game with Hoehn would usually receive checks which represented, either all or in part, their winnings from that game. During 1949 petitioner cashed the following checks signed by T. W. Hoehn: Date
Payee
Amount
4-29-49
Cash
$ 500
10-15-49
Cash
600
10-26-49
Cash
1,000
10-27-49
Cash
11,500
Total
$13,600
*138 Of the total amount $2,100 represents petitioner's winnings from gambling. During 1950 petitioner cashed the following checks signed by T. W. Hoehn: Date
Payee
Amount
1-31-50
Cash
$ 2,000
2- 1-50
Cash
10,000
7-22-50
Cash
6,000
8-22-50
Don Corum
6,000
Total
$24,000 The total amount of $24,000 represents petitioner's winnings from gambling. On September 19, 1950, two cashier's checks in the amount of $15,000 each were drawn to the order of T. W. Hoehn. Petitioner did not endorse or cash either of these checks and has not been shown to have received any of their proceeds. T. W. Hoehn died in March of 1952. Petitioner did not report any income from gambling on his tax returns for the taxable years. He did not keep any records of his gambling winnings or losses. Petitioner's accountant was never informed that petitioner had any gambling income. Petitioner reported taxable net income and income tax due on his tax returns for the taxable years as follows: Net Income
Tax Due
Year
Per Return
Per Return
1946
$ 5,799.76
$ 756.15
1947
19,154.97
5,488.62
1948
15,099.96
2,538.38
1949
4,500.40
348.66
1950
11,652.91
2,543.02
*139 The income for each of the taxable years 1946, 1947, 1949, and 1950 was understated, in the amounts of $360, $770, $2,100 and $24,000, respectively. A part of the deficiency for each of the years 1949 and 1950 was due to fraud with intent to evade tax. No part of the deficiencies for 1946 or 1947 was due to fraud with intent to evade tax. The income for the taxable year 1948 was not understated. Opinion Respondent has determined deficiencies in petitioners' income tax and additions to tax for the years 1946 to 1950, inclusive. Respondent relies on the net worth method to establish the deficiencies for the years 1946 to 1948, inclusive, and on the specific adjustment method for the years 1949 and 1950, based on certain checks alleged to represent unreported gambling gains received by petitioners during such years. In view of the different methods employed, the years 1946 to 1948, inclusive, will be considered separately from the years 1949 and 1950. The years 1946 to 1948, inclusive. Preliminarily, we dispose of petitioner's contention that respondent improperly resorted to the net worth method of computing the income for the years 1946 to 1948, inclusive, because respondent *140 has failed to establish (1) a likely source of unreported income, or (2) that petitioner's books and records were inaccurate or incomplete. There is no merit in either contention. Assuming, without determining, that evidence of a likely source of the unreported income attributed to the taxpayer is an indispensable element to the determination of deficiencies under the net worth method ( Constantine Thomas v. Commissioner (C.A. 1), 232 Fed. (2d) 520, reversing a Memorandum Opinion of this Court [14 TCM 156; T.C. Memo. 1955-46]; see, however, Bernard C. Hasson v. Commissioner (C.A. 6), 239 Fed. (2d) 778, affirming a Memorandum Opinion of this Court [14 TCM 443; T.C. Memo. 1955-121], and Anthony V. Thomas v. Commissioner (C.A. 6), 223 Fed. (2d) 83, reversing on other grounds a Memorandum Opinion of this Court) [15 TCM 983; T.C. Memo. 1956-185], the evidence relating to petitioner's gambling activities throughout each of the taxable years is sufficient evidence of such a source as to justify use of the net worth method herein. Nor is it a condition precedent to *141 the use of the net worth method that respondent prove specific inaccuracies in petitioner's books and records. Where the taxpayer presents a set of books that appear superficially adequate, the application of the net worth method may show such a substantial variance with the reported income as to suggest the untrustworthiness of the books. Estate of W. D. Bartlett, 22 T.C. 1228. Also, where the increase in net worth is greater than that reported on a taxpayer's returns, or is inconsistent with his books and records, the net worth method is cogent evidence that there is unreported income and that the records are inadequate, inaccurate or false. Morris Lipsitz, 21 T.C. 917, affirmed 220 Fed. (2d) 871, certiorari denied 350 U.S. 845. Petitioner reported net income of $40,054.69 for the taxable years 1946 to 1948, inclusive, whereas, as indicated by the statements attached to the notices of deficiencies, respondent determined that his net income computed under the net worth method was $52,239.24 ($52,093.24 on brief). Under the circumstances, respondent was entirely justified in resorting to the net worth method for computing petitioner's *142 net income for the years 1946 to 1948, inclusive. We do not mean to say, however, that respondent is to be sustained in the amounts of unreported income determined by him for each of these years. As pointed out in the Lipsitz case, supra, the net worth method is not a system of accounting but is merely evidence of income. Respondent's determination is prima facie correct and the burden is upon the petitioner to establish any inaccuracies therein. We think, however, that petitioner has sustained his burden in this case with respect to the amounts determined by respondent under the net worth expenditures method for the years 1946 and 1948, but has failed to sustain such burden for the year 1947. The amounts included under assets and liabilities in the net worth computation set forth in our findings of fact were all stipulated by the parties except those relating to automobile and as to these we have adopted petitioner's figures. [1] The amounts shown as premiums paid on life insurance and as payments on Federal income taxes have also been stipulated. *143 Petitioner attacks the accuracy of respondent's computation only with respect to two items, the amounts of cash on hand at the beginning of each year and the amounts shown as living expenses. Accordingly, we limit our discussion to these two items. First, with respect to cash on hand, petitioner relies on a computation made by his accountant showing that petitioner had cash on hand at the beginning of 1946 in the amount of $5,193.25. This amount, however, is not established by any evidence of record herein. When questioned as to evidence of such amount, petitioner's accountant testified "I have my records, profit and loss statement." No records were offered in evidence, however, to substantiate this amount of cash on hand, and no witness, including the petitioner, corroborated petitioner's accountant as to this item. On the contrary, petitioner testified that at times he had as much as $3,500 cash on hand which he kept in his pocket, but that this was all Motor Service Sales money and was reflected in the books of the company. Accordingly, petitioner has not established that respondent erred in failing to show separately the amount of cash on hand for any of the years involved. *144 The second item in controversy is that relating to living expenses. Respondent, in his net worth computation, has shown this item as $7,714.28 for 1946, $9,191.74 for 1947, and $9,826.77 for 1948. These figures represent the aggregate amount of the checks charged to petitioner's personal account on the books of Motor Service Sales for each of those years, except the checks which were issued to pay premiums on life insurance and Federal income taxes and two other checks noted in our findings, presumably used to purchase an automobile in 1946 and to make down payment on a house in 1947. The parties agree that those checks included in the aggregate amounts shown above, which were made payable to specific payees, other than petitioner, are correctly includible in the living expense items. Petitioner denies, however, that all of the checks made payable to petitioner or to cash represent cash living expenses and contends that respondent erred in so treating them. Specifically petitioner argues that respondent's computation does not take into account the cash deposits which were made by petitioner and were credited to his personal account during each of these years, or cash payments made *145 by petitioner upon the purchase of his house and for jewelry and government bonds. Also, that the amounts charged to living expenses in respondent's computation are not consistent with petitioner's standard of living during those years. Although the evidence is not as clear as might be desired, we have concluded that the amounts included in respondent's computation under the item of living expenses cannot be sustained. It has been pointed out that in determining expenditures it is improper to count both checks drawn to cash and items for which a taxpayer has paid cash unless it is shown that the cash withdrawals had nothing to do with the individual items. "Otherwise a man doubles his taxable income when he writes a check for 'cash' and spends the money he gets from his bank." United States v. Caserta, 199 Fed. (2d) 905; Mertens, § 12.12. Here, unlike Caserta where the burden of proof was upon the government, the burden is upon petitioner to establish the connection between the cash withdrawals and the individual items. Here again the evidence is not as clear as might be desired. Considering all the facts and circumstances, however, we think it fair to assume that *146 the expenditures for the items set forth as assets in the net worth computation came from the cash withdrawals. In this connection it is noted that petitioner, as was the custom in the used car business, carried substantial amounts of money in his pockets for the purpose of buying used cars from persons who demanded payment in cash rather than by check, and it is not improbable to assume that when purchases failed to materialize some of that cash was returned to the company and petitioner's account credited therewith. Also, it is a fact that a substantial portion of the purchase price of the house, as well as the jewelry and bonds was paid for in cash. The only assets owned by petitioner are those shown in the net worth statement, and his standard of living was very modest. We are not convinced that petitioner spent $6,125.23 in 1946, $5,416.64 in 1947, and $4,693.12 in 1948 for cash living expenses. Failure to accumulate wealth does not, of course, negative the realization or receipt of income. It may, however, be considered as evidential. Estate of Robert Lyons Hague, 45 B.T.A. 104, 110, affd. 132 Fed. (2d) 775, certiorari denied 318 U.S. 787. *147 In reaching our conclusion we have not overlooked the fact that petitioner gambled some during these years. There is no evidence, however, as to any specific amounts won by petitioner during these years, and his gambling was not as extensive as in later years. We have included in the net worth computation set forth in our findings the amounts which we consider properly includible as expenditures for living expenses. As indicated in our findings the net worth increase plus expenditures method, when correctly applied herein, fails to reveal that petitioner had any unreported income in the years 1946 and 1948, but that he did have unreported income in the year 1947 in the amount of $770. Each year is a separate taxable entity, Burnet v. Sanford & Brooks Co., 282 U.S. 359, and the burden was upon petitioner to establish inaccuracies in respondent's determination as to each of the years involved. He has failed to sustain this burden with respect to the year 1947, except to the extent we have indicated. Our finding that petitioner understated his income for the year 1946 in the amount of $360 is based upon the profit made by him upon the sale of an automobile in that year *148 which admittedly was not reflected on the books of Motor Service Sales and was not reported in his return. There remains for consideration as to the years 1946 to 1948, inclusive, the question of fraud, as to which the burden of proof is upon respondent. Section 1112, Internal Revenue Code of 1939. Our findings dispose of this question and it requires no discussion here. For the sake of completeness and clarity, it might be added that no question of limitations is presented by the pleadings herein. The years 1949 and 1950. In computing petitioner's unreported income for the taxable years 1949 and 1950, respondent has employed the specific adjustment method, based upon certain checks allegedly received and cashed by petitioner in connection with his gambling activities. Petitioner first contends that respondent should not be permitted to change from the net worth method for computing the taxable income for the years 1949 and 1950, and that such a change is an admission that continued use of the net worth method would have reflected no unreported income for those years. Section 41 of the Internal Revenue Code of 1939 provides, however, that if the method of accounting employed *149 by the taxpayer does not clearly reflect the income, "the computation shall be inaccordance with such method as in the opinion of the Commissioner does clearly reflect income." Accordingly, the choice as to the method of computation to be employed does not rest with the petitioner but with the respondent. Respondent is under no obligation to employ the net worth method. United Dressed Beef Co., 23 T.C. 879 (on appeal C.A. 9). Here respondent has offered proof of unreported income from gambling based upon certain checks received and cashed by petitioner. Respondent did not err in using the net worth method for computing petitioner's income for the years 1946 to 1948, inclusive, and the specific adjustment method for the years 1949 and 1950. We do not mean to say that petitioner was not entitled to offer evidence of net worth for these years for the purpose of comparison and, if possible, to show error in respondent's computation, United Dressed Beef Co., supra, and he was permitted to do so here. The net worth computation submitted by him, however, is a continuation of the computation submitted by him for the years 1946 through 1948, and the errors inherent *150 in his computation for those years are reflected in the computation for the later years. As previously indicated, there is no support in the record for the amount shown as cash on hand at the beginning of the period and petitioner's accountant had no knowledge and took no account of petitioner's gambling. Also, the amount shown for cash living expenses ($1,200.00) which remained unchanged for each of the years, merely represented the accountant's unsupported estimate. During the years 1949 and 1950, petitioner gambled frequently and over a wide area. Some of the games in which he participated admittedy involved bets at least as high as $300. Petitioner testified that on one occasion Hoehn refused to go through with a single bet of $1,000 because he refused to accept petitioner's check for that amount. Petitioner also admitted having won as much as $6,000, $7,000 or $8,000 during the years 1949 and 1950. T. W. Hoehn, a wealthy automobile dealer and friend of petitioner's who died in 1952, was a participant in most of the gambling games engaged in by petitioner. Hoehn was a heavy gambler, drank considerably during every game and was usually a heavy loser. Against this background we *151 examine respondent's determination that checks written by T. W. Hoehn in the aggregate amount of $13,600 in 1949 and $46,000 in 1950 represent income to petitioner from gambling. For the year 1949, four checks signed by Hoehn, payable to cash and endorsed by petitioner were offered in evidence. Petitioner admitted cashing these checks but denied that all the funds received therefrom constituted gambling winnings. The first check signed by Hoehn and dated April 29, 1949, was in the amount of $500. Petitioner admitted he cashed this check but states it "probably constituted a loan" to Hoehn at a time when the latter wanted some cash. In an earlier sworn statement given the internal revenue agent who was investigating his return, petitioner stated this check, or part of it, might represent gambling winnings. The second check, dated October 15, 1949, signed by Hoehn and endorsed by petitioner, was in the amount of $600. Petitioner admitted that he had written this check and Hoehn had signed it, but stated it also was a "loan" of cash to Hoehn. In his previous statement to the revenue agent, however, he admitted that this check or a part of it might represent gambling winnings and stated *152 that the form used and character of Hoehn's signature indicated it was given by Hoehn in a gambling game. Petitioner testified that the third check, dated October 26, 1949, signed by Hoehn and cashed by petitioner, in the amount of $1,000, could have been gambling winnings. The fourth of the Hoehn checks cashed by petitioner in 1949 was in the amount of $11,500 and dated October 27, 1949. As to this check, petitioner testified he had been called by Hoehn to a hotel room one afternoon and asked for money; that he loaned Hoehn $1,500 but Hoehn wanted $10,000 or more; that he then wrote out a check for $11,500 which Hoehn signed and petitioner then took to the bank and cashed after first having been identified to an officer of the bank by John Murdock, president of an automobile financing company; that he then took $10,000 of the money in a sack to Hoehn's hotel room and handed it to Hoehn through the doorway, but was not permitted to enter the room. Petitioner is corroborated in part by the testimony of Murdock, who identified him to the bank official and also by R. C. Moore, who testified that Hoehn had first requested Moore to obtain $10,000 in cash for him but that he had refused; *153 that he then heard Hoehn call petitioner on the telephone and later, as he (Moore) was leaving the hotel, he met petitioner in the hall carrying a sack in which he saw a "lot $100of bills;" that he saw petitioner walk towards Hoehn's room but did not see him enter or leave the room. Considering all the evidence and having observed the witnesses and carefully weighed the testimony of each, we have concluded and found as a fact that $2,100 of the checks mentioned above represent income to the petitioner from gambling in the year 1949. The check in the amount of $11,500 does not represent income to petitioner but was money loaned by petitioner to Hoehn or obtained by petitioner from the bank for, and turned over to Hoehn. Since petitioner did not report any income from gambling on his income tax return for 1949, he understated his net taxable income for that year in the amount of $2,100. For the year 1950 respondent offered in evidence four checks written by Hoehn, three payable to cash and one to Don Corum. Two of these checks, one dated January 31, 1950, in the amount of $2,000 and one dated August 22, 1950, in the amount of $6,000, were endorsed by petitioner in his own name. Another, *154 payable to cash and dated July 22, 1950, in the amount of $6,000, bears the endorsement "L. D. Kendall" (or "Koball"), which petitioner admitted was in his handwriting but could not explain why he had not endorsed it with his own name. He obtained the cash on all three and, either at the hearing or in his previous statement to the revenue agent, admitted that they could have represented winnings from gambling. The fourth check, payable to cash and dated February 1, 1950, is in the amount of $10,000. It bears an endorsement which is indecipherable, but petitioner admitted receiving the cash on this check. He claims, however, that this check, like the $11,500 check in 1949, represents cash which he obtained at Hoehn's request and delivered in a sack to Hoehn at the latter's hotel room. He has attempted to corroborate his story concerning this check by testimony of L. D. Stovall, a former employee of petitioner, who testified by deposition that "about two or three months before Mr. Hoehn died" he accompanied petitioner to the bank for the purpose of cashing a $10,000 check for Hoehn. Neither petitioner nor Stovall was sure of the exact date, and since the check was dated February 1, 1950, and *155 Hoehn died in 1952, we give no weight to Stovall's testimony. Also, on brief, petitioner has attempted to relate the testimony of R. C. Moore to this check, as well as the $11,500 check dated October 27, 1949. It obviously could not relate to both. Considering all the evidence and carefully weighing the testimony of each of the witnesses, we have concluded and found as a fact that all of the checks mentioned above, aggregating $24,000, represent income to the petitioner from gambling in the year 1950. In so doing we have not overlooked the fact, as testified to by some of the witnesses, that Hoehn was in the habit of taking all the cash in a game and giving one check for all of it, including his losses, and that such checks might represent cash which petitioner himself had put into the games. Petitioner has failed in his burden, however, to establish the amounts, if any, included in the checks involved which did not represent his gambling winnings and the evidence is not such as to enable us to apply the Cohan rule (39 Fed. (2d) 540). Likewise, we give no weight to petitioner's unsupported claim that he sustained losses for either of these years at least in the amount *156 of his gains. Here also petitioner has failed to sustain his burden. Section 23(h) of the Internal Revenue Code of 1939; Bodoglau v. Commissioner, 230 Fed. (2d) 336, affirming sub nom Michael Potson, 22 T.C. 912. Moreover, there is evidence petitioner had other winnings, some of which were received in cash, which may or may not have exceeded his losses. Respondent also offered in evidence two cashier's checks, dated September 19, 1950, in the amount of $15,000 each and drawn to the order of T. W. Hoehn. Both were endorsed by Hoehn, and by "N. H. Branch." The latter was not identified by any of the witnesses in this case, and petitioner denied that such endorsement was written by him or that he had ever had possession of either check. Respondent attempted to connect petitioner with one or the other of these checks through the testimony of E. T. Hutton, who testified that at or about the dates shown thereon he had received a check from Hoehn in the amount of $13,000; that this check represented $6,000 winnings of himself and $7,000 winnings of petitioner; that the bank refused to cash the $13,000 check and Hoehn gave him a cashier's check in the amount of *157 $15,000 in return for the $13,000 check and two other checks which Hutton had in the amount of $1,000 each; that he (Hutton), not wishing to cash the cashier's check himself had given it to petitioner, who obtained the cash thereon, turned $8,000 over to Hutton and retained $7,000. There is some evidence of hard feelings between Hutton and petitioner and also that Hutton had been involved in income tax difficulties of his own (which had been settled) in connection with which he might have been interested in minimizing his own gambling winnings. Without more positive evidence we cannot say that petitioner received any of the proceeds of either of these checks. Our findings reflect this conclusion. Since petitioner did not report any income from gambling on his income tax return for 1950, he understated his net taxable income for that year in the amount of $24,000. There remains for consideration the question whether petitioners are liable for additions to tax under section 293(b) of the Internal Revenue Code of 1939. We have already indicated our conclusion that no part of the deficiencies for 1946 and 1947 was due to fraud with intent to evade tax. We think the evidence requires *158 a different conclusion for the years 1949 and 1950 and, in our findings, have found as a fact that a part of the deficiencies for each of the years 1949 and 1950 was due to fraud with intent to evade tax. Petitioner's failure to report substantial amounts received by him from gambling during these two years is clear and convincing evidence to us that he deliberately intended to evade liability for income tax thereon. Decisions will be entered under Rule 50. Footnotes
1. Respondent has adopted the same amounts in his computation set forth on brief, though his original computations (see statements attached to answers) showed only $1300 for automobile for the years 1946 to 1948, inclusive.↩